IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DEXCOM, INC., <br><br> Plaintiff, <br><br> v. <br><br> ABBOTT DIABETES CARE INC. and <br> ABBOTT DIABETES CARE SALES CORP., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) C.A. No. 22-605 (KAJ) <br> ) CONSOLIDATED <br> ) <br> ) <br> ) <br> ) |
| ABBOTT DIABETES CARE INC., <br><br> Plaintiff, <br><br> v. <br><br> DEXCOM, INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 21-1699 (KAJ) <br> ) <br> ) <br> ) <br> ) |

**ABBOTT'S BRIEF IN SUPPORT OF ITS
RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

**INTRODUCTION**

Abbott[1] respectfully moves for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). The evidence presented at trial cuts decisively in Abbott's favor. Based on that evidence, no reasonable jury could find against Abbott on any of its claims in this case, and no reasonable jury could find for DexCom on its claim that Abbott breached the dispute resolution clause. The Court should enter judgment for Abbott on every issue in the case.

**LEGAL STANDARDS**

Judgment as a matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). A court must "view[] the evidence in the light most favorable to the nonmoving party," *Morgan v. Covington Township*, 563 F. App'x 896, 899 (3d Cir. 2014), but "a scintilla of evidence is not enough" to tip the scales in favor of the non-moving party. *Norman v. Elkin*, 860 F.3d 111, 129 (3d Cir. 2017).

**ARGUMENT**

**I.   Abbott Has A License To The Relevant Claims Of The '452 And '215 Patents**

Abbott has a license to the claims of the '452 and '215 patents at issue here. No reasonable jury could conclude otherwise. As part of the Settlement and License Agreement ("SLA"), Abbott received a license to "DexCom Licensed Patents" for "ADC Products." JTX-1 ¶ C.2. A separate warranty provision, ¶ H.3, provides an insurance policy that grants Abbott an equivalent license if DexCom later obtains patent claims that would fall within the scope of "DexCom Licensed Patents" but for DexCom manipulating the priority chain for those future patents. JTX-1 ¶ H.3. Abbott has an express license to the claims of the '452 patent under ¶ C.2 and a license to claim 1

---

[1] "Abbott" refers to Abbott Diabetes Care Inc. ("ADC") and Abbott Diabetes Care Sales Corp. ("ADC Sales"). "DexCom" is DexCom, Inc.

of the '215 patent under the warranty provision in ¶ H.3.  In addition, both the specific components of the FreeStyle Libre products DexCom accuses of infringement—the only components that matter for purposes of this licensing case—fall within the definition of "ADC Products."  The Court should enter judgment that Abbott is licensed as a matter of law.

### A. Abbott Has A License To The Claims Of The '452 Patent

The claims of the '452 patent are "DexCom Licensed Patents."[2]  The SLA's definition of "DexCom Licensed Patents" has three relevant parts. JTX-1 ¶ A.13. *First*, DexCom granted a license to DexCom patents and patent applications with pre-2005 filing dates.  *Id.* ¶ A.13(a).  *Second*, DexCom granted a license to its patents claiming priority to those pre-2005 patents and applications.  *Id.* ¶ A.13(b).  *Third*, in ¶ A.13(c), DexCom granted a license to a claim in any patent that "claim[s] priority to a patent captured in subsection (b), but not claiming priority to a patent or application captured in subsection (a)," if the claim "is fully supported and enabled in the manner required under 35 U.S.C. § 112."  ¶ A.13(c).

Every claim of the '452 patent satisfies the requirements of ¶ A.13(c).  There is no dispute the '452 patent claims priority to the '282 patent (PTX-121).  JTX-8; *see also* Tr. 731:17-733:17.  The '282 patent, in turn, claims priority to the '683 application (PTX-35)—a pre-2005 DexCom patent application.  *See* JTX-121; *see also* Tr. 728:25-730:16.  The '452 patent thus satisfies the first part of the test in ¶ A.13(c).  The patent claims priority to a patent captured by ¶ A.13(b) (a DexCom patent that claims priority to a pre-2005 DexCom patent application), but does not itself claim priority to a pre-2005 patent or application.  *See* JTX-1 ¶ A.13(c)(i).

The claims in the '452 patent are likewise fully supported and enabled by the '683 application.  A claim is fully supported by the written description in the '683 application if the

---

[2] The claims of the '452 patent at issue here are claims 1, 7, 10-11, 14, 19, 23, 26-27, 45, 48-49 41, 62-63, and 67-68.

3

'683 application "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). Under this test, the disclosure is not "limited to a preferred embodiment," *Lampi Corp. v. Am. Power Prods, Inc.*, 228 F.3d 1365, 1378 (Fed. Cir. 2000), or insufficient "just because [the claim] is broader than the specific examples disclosed." *Lochner Techs., LLC v. Vizio, Inc.*, 567 F. App'x 931, 939 (Fed. Cir. 2014). The '683 application similarly "need not include subject matter that is known in the field of the invention" because "patents are written for persons experienced in the field of the invention." *S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1371 (Fed. Cir. 2001). The "critical inquiry" is instead whether the written description provides "sufficient detail that a person of ordinary skill would understand that the inventor was in possession of it at the time of filing." *Alcon Rsch., Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1190-91 (Fed. Cir. 2014).

Dr. Schurman explained why a skilled artisan reading the '683 application "would understand" that DexCom "possess[ed]" every element of every relevant claim in the '452 patent. He identified where each of the structure elements of the claims—such as a sensor, electrical contacts, an electronics unit, a contact holder, and a mounting unit—are disclosed in the '683 application. Tr. 743:12-744:4, 752:2-10; Tr. (7/12/23) 356:1-359. DexCom's expert, Dr. Gall, did not dispute the '683 patent adequately describes these structural elements. Dr. Gall instead confirmed that there are only three elements in dispute: (1) whether the sensor is sandwiched between the upper portion and the lower portion of the sealing member (claims 14, 19, 23, 26, 27, 41, 45, 48, 49, and 68); (2) whether the durometer hardness of the electrical contact is higher than the durometer hardness of the sealing member (claims 1, 7, 10, 11, 14, and 63); and (3) whether the sealing member is held at least in part on the contact holder by mating male-female mechanical

4

structures (claims 10, 26, 48, 62, 63, and 67). Tr. (7/12/23) 314:17-315:4. The evidence shows that the '683 application describes each of these elements as a matter of law.

*First*, a skilled artisan would recognize the '683 application sandwiches the sensor between upper and lower portions of the sealing member. That application describes inserting the sensor with a canula that creates an opening in the seal through which the needle and senor are inserted. This opening creates an upper and lower portion of the seal. Tr. (7/12/23) 62:2-12. A skilled artisan would understand that the sensor is sandwiched between those upper and lower portions as the canula is withdrawn and the seal returns to its original position. When the user places the electronics unit on top of the seal, the resulting force compresses and further sandwiches the seal between the upper and lower portions. Tr. (7/12/23) 38:19-41:6, 59:16-62:12. Dr. Gall's only response is that the '683 patent supposedly only describes a "unitary" seal. Tr. (7/23/23) 62:13-22, 317:5-17. But that is an improper attempt to limit the claims to a preferred embodiment rather than considering what the '683 patent's teachings would reasonably convey to a skilled artisan.

The '683 application similarly discloses electrical contacts with a durometer hardness that is higher than the hardness of the sealing member. Dr. Schurman explained that the '683 application teaches using silicone for the seal and metal for the electrical contacts, a combination in which the electrical contacts would necessarily be harder than the seal. Tr. (7/13/23) 51:4-52:14. Dr. Gall agreed. The '683 application further teaches using a carbon black elastomer for the electrical contacts. A skilled artisan, according to Dr. Schurman's testimony, would know that adding carbon black to a silicon base material would make the base material harder. Tr. (7/13/23) 52:15-54:3. For his part, Dr. Gall acknowledged that there are only three possibilities for relative hardness—contacts harder than seal, seal harder than contacts, and same hardness—and that a skilled artisan implementing the teachings of the '683 application would want to use harder

5

electrical contacts. Dr. Gall was left only with the opinions that there is no mention of "durometer," "shore hardness," and "ASTMD2240" in the '683 application, that the '683 application provides additional description regarding durometer hardness beyond what the '683 application says, and that the '683 application describes the possibility of using contacts that are softer than the seal. None of these opinions are relevant to the question of whether the necessary relative durometer hardness is sufficiently described in the pre-2005 '683 application.

That leaves male-female connectors. Dr. Schurman explained at length where the figures and written description in the '683 application describe male-female connectors. Tr. (7/12/23) 62:23-63:11, 64:23-67:12. DexCom did not offer substantial evidence suggesting otherwise. Dr. Gall offered only a hyper-literal reading of the '683 application's figures divorced from the understanding a skilled artisan would have of what those figures teach. It is true that some of the '683 application's figures depict a female structure on one side of the contact holder and a male structure on the other side of the seal. But a skilled artisan would understand both structures were on both sides of the seal and contact holder, mating with each other just as depicted in the corresponding figure of the '452 patent. The fact the '452 patent includes a slightly different figure does not detract from what a skilled artisan would understand the '683 application reasonably conveys. Dr. Gall confirmed these structures were known by persons of ordinary skill in the art.

Dr. Schurman then addressed how the '683 application would enable a skilled artisan to practice the relevant claims in the '452 patent. Tr. (7/12/23) 55:5-59:15, 63:7-11, 64:2-22. His opinion is supported by the testimony of Dr. Taub. Tr. 319:13-335:2; Tr. (7/12/23) 56:14-59:15. The enablement requirement is satisfied if a skilled artisan, reading the specification, would be able to "make and use the claimed invention" without undue experimentation. *FS.com Inc. v. Int'l Trade Commission*, 65 F.4th 1373, 1375 (Fed. Cir. 2023); *Amgen v. Sanofi*, 143 S. Ct. 1243, 1254

6

(2023). When assessing enablement, the specification must again be "viewed from the perspective of one of skill" in the relevant art, *Ajinomoto Co. v. Int'l Trade Comm'n*, 932 F.3d 1342, 1359 (Fed. Cir. 2019), and thus "a patentee can rely on information that is 'well-known in the art.'" *Streck v. Rsch. & Diagnostic Sys.*, 665 F.3d 1269, 1285 (Fed. Cir. 2012). Dr. Gall did not even dispute enablement. He candidly admitted he "didn't focus on it," Tr. (7/12/23) at 348:1-6, and in fact did not address it at all in his testimony beyond a few conclusory statements that misstated the law. In the end, the idea that the '683 application does not disclose or enable the relevant claims of the '482 patent is wrong as a matter of law.

### B.      Abbott Has A License To Claim 1 Of The '215 Patent Under ¶ H.3

DexCom licensed claim 1 of the '215 patent by breaking promises it made in ¶ H.3 of the SLA. In that provision, DexCom represented that it would not "obtain the issuance of a patent claim" that is "fully supported and enabled" by a pre-2005 DexCom patent or patent application but "excluded from the definition of DexCom Licensed Patents." JTX-1 ¶ H.3. If DexCom breaks that promise, Abbott is "deemed licensed to such claim on a royalty-free, non-exclusive and non-sublicensable basis [] consist[e]nt with Paragraph C.2." *Id.*

The evidence establishes beyond dispute that claim 1 of the '215 patent is fully supported and enabled by the '549 patent (PTX-415), a pre-2005 DexCom patent that incorporates by reference all the teachings of the '509 patent (PTX-56). Both sides' experts agree for purposes of this licensing case that Claim 1 of the '215 patent effectively recites two low glucose alerts or alarms—a user-settable real time alert or alarm and a non-user-settable predictive alert and alarm. Tr. 602:13-606. There is no dispute that the '549 patent (and the '509 patent it incorporates) fully supported and enabled the user-settable real time alert and alarm. Tr. 609:9-611:20, 614:2-617:17, 623:10-625:16, 625:20-628:8, 629:2-18.

DexCom does dispute whether the '549 patent fully supported the non-user-settable predictive alert and alarm, but no reasonable jury could find in its favor. Mr. Harper testified that, in 2002, "[i]t was straightforward to do the fixed alarm." Tr. 292:2-14. In addition, the '549 patent (and the '509 patent it incorporates) describes low glucose clinical danger zones that could alert the user if an "estimated" glucose value fell within the danger zone. Tr. 609:9-614:1, 617:18-6220:6, , 623:10-625:16, 628:4-629:18. As Dr. Steil explained, these estimated glucose values are described in the '549 patent as predictive of future hyperglycemic events. Tr. 631:3-634:3. Further, the '549 patent expressly states that the clinical danger zones "can be set by a manufacturer, customized by a doctor, and/or set by a user via buttons [], for example." PTX-415 at 44:30–57; *see also* PTX-56 ("The analyte monitor device may be configured so that the threshold levels for these or any other conditions may be programmable by the patient and/or a medical professional"); Tr. 630:3-631:2. This teaches a menu of options for who can set the danger zone, including only the manufacturer, in which case the danger zone would be non-user-settable. Tr. 634:8-637:8. Dr. Jafari's contrary opinion—that the danger zone can necessary be set by both the manufacturer and the user is not supported by substantial evidence and reads the "and/or" phrase out of the '549 patent. Tr. 634:4-637:8. A reasonable jury could not credit his testimony. DexCom offered no evidence rebutting Abbott's enablement evidence, including the testimony of Mr. Harper and Dr. Steil.

The evidence, even viewed in the light most favorable for DexCom, thus supports only one conclusion. DexCom obtained claim 1 of the '215 patent in violation of the promises it made in ¶ H.3, and as a result, Abbott has a license to that claim.

### C.  The Sensors and Components That Operate Together With Those Sensors In The FreeStyle Libre Products Are "ADC Products"

The in vivo sensors and FreeStyle Libre components that operate together with those sensors—the components of the FreeStyle Libre products DexCom accuses of infringement—are "ADC Products" as a matter of law.  An ADC Product includes "an electrochemical sensor, made by or for ADC, using an enzymatic reaction and using an osmium mediator to transfer electrons to an electroactive surface for measurement of glucose concentration that is placed *in vivo*."  JTX-1 ¶ A.3.  DexCom stipulated the electrochemical sensors in the FreeStyle Libre products are made by or for ADC and there is no dispute those sensors have all the other properties recited in the definition of ADC Products.  Tr. 351:19-354:6, 355:15-356:17, 517; Tr. (7/12/23) 73:22-76:2.  There is likewise no dispute that the sensor delivery units, radio frequency communication systems, and hardware and software for determining and displaying glucose values in the FreeStyle Libre products—three other components that qualify as ADC Products—are made or customized by or for ADC.  Tr. 354:14-356:17, 517; Tr. (7/12/23) 73:22-76:2.

But DexCom apparently believes what the SLA gives with one hand, it takes away with the other.  As part of the definition of "ADC Products," the SLA states that "'ADC Products' does not include Ancillary Products," such as blood glucose meters.  JTX-1 ¶¶ A.3, A.6.  This language sets up a clear distinction:  ADC In Vivo Sensors and ADC Components used with those sensors are ADC Products; Ancillary Products are not.  But DexCom reads this language to mean that, in a device that contains both ADC In Vivo Sensors and ADC Components and Ancillary Products, even the ADC In Vivo Sensors and ADC Components are no longer licensed.

DexCom attempts to put the same gloss on the "for the avoidance of doubt" clause in the definition of ADC Products.  But that clause says the exact opposite, specifying that "for the avoidance of doubt, if ADC Products are used in combination with Ancillary Products, then neither

9

such Ancillary Products nor the combination shall be included within the definition of ADC Products, ***but the ADC Products themselves will continue to be included within the definition of ADC Products***." JTX-1 ¶ A.3.  Under this clause, the ADC In Vivo Sensor and ADC Components remain ADC Products even if used in combination with a blood glucose meter or other Ancillary Product as a matter of law.

The definition of ADC Products is thus unambiguous and DexCom's alternative reading of that provision is wrong several times over.  *First*, the electromechanical sensors, applicators, radio frequency communication systems, and hardware and software for determining and displaying glucose values in the FreeStyle Libre products—the components DexCom accuses of infringing its patents and that Abbott alleges are licensed—are unambiguously still licensed ADC Products under the unambiguous contract language regardless of the other components with which they may be combined.

*Second*, even under DexCom's theory, there is no reader today for FreeStyle Libre 3 devices sold in the United States; users check their glucose levels exclusively using a cell phone app.  For that reason, even DexCom concedes the entire FreeStyle Libre 3 system is an ADC Product.  *See* Tr. 515:25-516:4.  The Libre 3 is not the only FreeStyle Libre product that allows users to check their glucose levels using an app. Tr. 345:13-19.  Libre 14-day, Libre 2, and Libre Sense users can choose to monitor their glucose levels using an app rather than a reader as well. DexCom again concedes that when these systems are used without a reader, each one is an ADC Product.  Tr. 515-16.  Given these concessions, the Court should enter judgment as a matter of law for at least these FreeStyle Libre products.

*Third*, even if there were any ambiguity, the evidence decisively resolves that ambiguity in Abbott's favor. The relevant question is whether components are licensed, not whether the product

as a whole is an ADC Product. Ms. Hansen described the relevant portion of the ADC products definition and its negotiation history. As Ms. Hansen explained, the "for the avoidance of doubt clause" of the ADC products definition was aimed at addressing the fact that both parties' CGM products were used with Ancillary Products, including blood glucose meters, at the time of the negotiation of the SLA. Tr. 476:16-481:8. DexCom admitted that its G4, G5, G6, and G7 products "meet[] the definition of DexCom products in section A(14) of the SLA" and that "DexCom instructed STX, STS7, G4, G5, G6, and G7 users to also use blood glucose meter which uses blood glucose test strips under certain circumstances." Tr. 515:9-24; PTX-3558.

Ms. Hansen further explained how the parties accounted for that in their agreement by providing that if licensed products are used in combination with an Ancillary Product, the licensed products would remain licensed while the Ancillary Products and combination would not. Tr. 483:8-484:21, 485:12-486:12, 486:25-487:11; *see also* PTX-1909; PTX-2253. She further explained that the ADC Products are defined to include the sensors and components used with those sensors in a CGM system. Tr. 463:16-474:22. The undisputed evidence at trial—including from Dr. Marc Taub and Dr. Schurman—was that every single accused feature of the FreeStyle Libre systems meets the definition of the licensed ADC Products, and none of those accused features is in the built-in blood glucose meter and strip port. As such, even if the accused FreeStyle Libre components are used in combination with the built-in strip port and blood glucose meter, the accused components remain licensed.

## II. DexCom Breached The SLA In Multiple Ways

The Court has already held DexCom breached the SLA's forum selection clause by filing suit in Texas rather than Delaware. D.I. 483 at 1-3. The Court should now grant judgment as a matter of law that DexCom also breached the SLA by filing suit asserting patents it licensed to

11

Abbott and by filing and continuing to prosecute that lawsuit without following the SLA's dispute-resolution procedure.

### A. DexCom Breached The SLA's Licensing Provisions

"[A] patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee." *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275-76 (Fed. Cir. 2009). DexCom broke that promise by asserting that licensed components of the FreeStyle Libre products infringed licensed claims of the '452 and '215 patents. As the Court previously ruled, assuming Abbott is licensed, "DexCom [] violated that license grant by suing Abbott." D.I. 484 at 4. This Court's decision is hardly an outlier. Courts across the country have similarly held a licensor "as a matter of law commit[s] a material breach of [a] License Agreement" by filing suit asserting licensed patents. *Sanitec Indus. v. Micro-Waste Corp.*, 2006 WL 3455000, at *39-40 (S.D. Tex. Nov. 28, 2006); *STMicroelectronics N.V. v. Agere Sys., Inc.*, 2009 WL 144405, *4 (Del. Super. Ct. May 19, 2009); *Edge of the Woods v. Wilmington Savings Fund Society, FSB*, 2001 WL 946521, *7 (Del. Super. Aug. 16, 2001) (breached contractual release by "institut[ing] and maint[aining]" an action on released claims). And by suing Abbott on the '215 patent, DexCom not only breached the license it granted Abbott, but also breached its representation and warranty under ¶ H.3 that it would not obtain such a patent.

DexCom's primary response is that a license is not a promise not to sue when a contract contains a separate, more limited covenant not to sue. The Court previously rejected that argument as well. "That the SLA contains both a license grant and a covenant not to sue does not mean that there can be no overlap between the two provisions such that the license ceases to provide protection against suit." D.I. 484 at 4 (citing *Jacobs v. Nintendo of Am., Inc.*, 370 F.3d 1097, 1099 (Fed. Cir. 2004)). Indeed, nothing in the SLA suggests the license grants in paragraphs C.2 and H.3 conferred an affirmative defense to an infringement claim divorced from the promise not to

12

sue. Under the SLA, a license and a covenant not to sue instead remain "the same thing." *Cornell Univ. v. Illumina, Inc.*, 2014 WL 12601516, *5 (D. Del. Sept. 29, 2014).

Abbott is not required to establish damages to succeed on its breach claim. "It is axiomatic that when there is a breach of a valid and binding contract … [t]he party whose legal right has been invaded is entitled to at least nominal damages, for the law recognizes that every injury imports damage." *Invize of Milwaukee, LLC v. Complex Litig. Support, LLC*, 1111179, at *12 n.48 (Del. Ch. Apr. 27, 2009); *see Norman v. Elkin*, 860 F.3d 111, 128-29 (3d Cir. 2017) (applying Delaware law, holding a court "erred in rejecting the breach of contract claim … on the grounds that Norman could not prove anything but nominal damages"). This small nominal award is "'fixed without regard to the amount of loss'" to "vindicate a breach of contract" and establish the rights of the parties. *In re P3 Health Grp. Holdings, LLC*, 2022 WL 16548567, *9 & n.2 (quoting Restatement (Second) of Contracts § 346(2)); *see also Invize*, 1111179 at *12 (nominal damages awarded "in recognition of a technical injury"). A judgment that DexCom breached the SLA's licensing provisions will vindicate Abbott's license rights and establish that DexCom cannot subject Abbott to the burden and expense of defending against infringement claims asserting licensed patents. *See* Tr. 465:2-23 (describing Abbott's burden and expense).

### B.     DexCom Breached The SLA's Dispute Resolution Clause

"[T]he failure to follow contractually mandated dispute resolution procedures constitutes a material breach of the contract." *Lennox Indus. Inc. All. Compressors LLC*, 2020 WL 4596840, *3 (Del. Super. Aug. 10, 2020). In the event of "dispute(s) aris[ing] from, under or relating to th[e] Agreement," the SLA requires Abbott and DexCom to meet and discuss the dispute according to specific procedures designed to avoid disputes and ensure peace. JTX-1 ¶ J.1. The procedure includes negotiations over as many as 89 days—including a notice, an initial meeting, and in-person meetings involving the company presidents. *Id.* If the parties still did not resolve their

differences, only then could either one pursue other remedies "including instituting litigation subject to the forum selection clause provided in Paragraph J.4 of th[e] Agreement." *Id.*

Rather than follow the contractually required dispute resolution process, DexCom filed suit in the Western District of Texas. Tr. 349, 712:5-16; Tr. (7/12/23) 135-37. Abbott's counsel sent DexCom's counsel a letter telling DexCom that Abbott believed DexCom had breached the Settlement and License Agreement by filing its Texas suit without notice and that Abbott asserted the patent claims DexCom had asserted in its Texas litigation were licensed and that the case should be transferred to Delaware. Tr. (7/12/23) 135-37. Abbott asked DexCom to dismiss its lawsuits or to meet in good faith under the dispute resolution clause. Tr. (7/12/23) 135-37.

Although the DRC says the parties "***shall meet***" within 14 day of notice, DexCom declined to meet. JTX-1 ¶ J.1; Tr. (7/12/23) 135-37. Abbott asked DexCom multiple times to meet under the dispute resolution clause. Tr. (7/12/23) 135-37. DexCom's counsel sent Abbott's counsel multiple letters, but never agreed to meet. Tr. (7/12/23) 135-37. On October 15, 2021, Abbott told DexCom it remained willing to meet at any time if DexCom changed its mind. Tr. (7/12/23) 135-37. DexCom never agreed to have the meetings that Abbott requested under the dispute resolution clause. Tr. (7/12/23) 135-37. The parties are now in the middle of trial, and DexCom still has not been willing to meet about Abbott's dispute. Tr. 712:5-116.

DexCom's conduct breached the dispute resolution clause in multiple ways. DexCom instituted its infringement action without first (1) giving prior notice of that dispute to Abbott, (2) meeting with anyone at Abbott about those disputes, (3) having the company presidents meet, and (4) "discuss[ing] and negotiat[ing] an expeditious resolution of th[ose] disput[s] in good faith." JTX-1 ¶ J.1; Tr. (7/12/23) 135-37. DexCom further breached the dispute resolution clause by (5) not "instituting litigation subject to the forum selection clause" and instead filing suit in Texas.

14

JTX-1 ¶ J.1; Tr. 349; *see also* D.I. 483 at 1-2.  If that were not enough, DexCom breached the SLA again leading up to Abbott filing its license action by (6) refusing to meet as the dispute resolution clause required.  JTX-1 ¶ J.1; Tr. (7/12/23) 135-37.  That amounts to at least six different breaches of the dispute resolution clause.  And the Court has already held that this clause applies because both DexCom's initial suit and Abbott's license case involve disputes that arise from, under or relate to the SLA.  *See* D.I. 483 at 1-2.  Like the licensing breaches, Abbott is not required to prove actual damages to establish DexCom breached.  Delaware law "infers some damages," so a party "whose legal right has been invaded by such breach is entitled to at least nominal damages."  *Ivize*, 2009 WL 2009 WL 1111179, at *12 n.48

DexCom cannot dispute its conduct.  In deposition testimony played for the jury, Mr. Pacelli candidly admitted that DexCom did not follow the SLA's dispute resolution procedure.  Instead, DexCom offers a baseless "condition precedent" argument.  According to DexCom, it had no obligation to comply with the dispute resolution clause unless Abbott first provided pre-litigation notice that it believed the parties had a licensing dispute subject to the SLA.  That makes no sense.  Abbott is not required to guess in advance that DexCom plans to file suit and ask to meet.  The SLA is instead unambiguous that DexCom had a duty to give Abbott prior notice and go through the 89-day dispute resolution process before instituting litigation.  Were there any doubt, the Court rejected a virtually identical condition-precedent theory when it granted Abbott summary judgment that DexCom breached the forum selection clause.  D.I. 483 at 1-3; D.I. 377 at 3-4 (DexCom raising similar condition precedent argument for forum selection clause).  DexCom did not provide the required notice and breached the dispute resolution clause several times over as a matter of law.

### III. Abbott Did Not Breach The Dispute Resolution Clause

Although DexCom breached the dispute resolution clause, Abbott did not. As an initial matter, the IPRs that Abbott filed do not "arise[] from, under or relat[e] to" the SLA and thus do not trigger the dispute resolution clause. JTX-1 ¶ J.1. Abbott's IPRs arise from, under, and relate to the Patent Act's provisions governing IPRs, 35 U.S.C. § 311 *et seq.* and the statutory requirements for patentability—not the SLA or any of its provisions under 35 U.S.C. §§ 102 and 103. The IPR challenges will not impact the rights or obligations of the parties under the SLA in anyway. *See, e.g.*, *Kannu Pty. Ltd. v. Samsung Elecs. Co.*, 15 F.4th 1101, 1108 (Fed. Cir. 2021). For that reason, the IPRs are unlike DexCom's infringement suit. The IPRs are also expressly permitted by the challenge clauses in ¶¶ F.3 and F.4, and so there was no need to go through the dispute resolution process for that reason as well.

Even if the dispute resolution provision did apply, Abbott complied with its obligations under that provision. After DexCom repeatedly refused to meet with Abbott, on October 15, 2021, Abbott told DexCom it remained willing to meet any time if DexCom changed it mind. DexCom never agreed to have the meetings that Abbott requested under the dispute resolution clause. Tr. 135-136. Abbott had thus fully complied with any dispute resolution obligations when it filed the IPRs in April 2022. It requested to met to discuss DexCom's dispute under the SLA and the IPRs are a direct defense to the litigation filed by DexCom. Tr. 411-413. Indeed, any further efforts would have been futile. In these circumstances, no reasonable jury could find Abbott breached the dispute resolution clause.

### II. CONCLUSION

The Court should grant judgment as a matter of law in Abbott's favor.

OF COUNSEL:

Ellisen Shelton Turner
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA  90067
(310) 552-4200

Amanda J. Hollis
Gregory B. Sanford
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 862-2000

Benjamin A. Lasky
Ashley Ross
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
(212) 446-4800

Jason M. Wilcox P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000

Leland G. Hansen
James M. Hafertepe
Sharon A. Hwang
Michael J. Carrozza
Manuela Cabal
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, IL  60661
(312) 775-8000

July 13, 2023

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Anthony D. Raucci*

---

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
rsmith@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 13, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on July 13, 2023, upon the following in the manner indicated:

| | |
|---|---|
| John W. Shaw, Esquire<br>Andrew E. Russell, Esquire<br>Nathan R. Hoeschen, Esquire<br>SHAW KELLER LLP<br>I.M. Pei Building<br>1105 North Market Street, 12th Floor<br>Wilmington, DE  19801<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |
| Nathan Hamstra, Esquire<br>Jonathon Studer, Esquire<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>191 North Wacker Drive, Suite 2700<br>Chicago, IL  60606<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |
| Valerie Lozano, Esquire<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>865 S. Figueroa Street, 10th Floor<br>Los Angeles, CA  90017<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |
| Cary E. Adickman, Esquire<br>Brian P. Biddinger, Esquire<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>51 Madison Avenue, 22nd Floor<br>New York, NY  10010<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |
| David Bilsker, Esquire<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>50 California Street, 22nd Floor<br>San Francisco, CA 94111<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |

Kevin P.B. Johnson, Esquire  VIA ELECTRONIC MAIL
Margaret Shyr, Esquire
Todd M. Briggs, Esquire
Cat Williams, Esquire
Zak Randell, Esquire
QUINN EMANUEL URQUHART & SULLIVAN LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA  94065
*Attorneys for Plaintiff*

Gavin Frisch, Esquire  VIA ELECTRONIC MAIL
QUINN EMANUEL URQUHART & SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, MA  02119
*Attorneys for Plaintiff*

Theodore Kwong, Esquire  VIA ELECTRONIC MAIL
HILGERS GRABEN PLLC
10000 North Central Expy., Suite 400
Dallas, TX  75231
*Attorneys for Plaintiff*

Sophie A. Hood, Esquire  VIA ELECTRONIC MAIL
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA  94111-1809
*Attorneys for Plaintiff*

/s/ *Anthony D. Raucci*
_____
Anthony D. Raucci (#5948)