IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DEXCOM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-605 (KAJ) |
| | ) | CONSOLIDATED |
| ABBOTT DIABETES CARE INC. and | ) | |
| ABBOTT DIABETES CARE SALES CORP., | ) | |
| | ) | |
| Defendants. | ) | |
| ABBOTT DIABETES CARE INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1699 (KAJ) |
| | ) | |
| DEXCOM, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ABBOTT'S OPENING BRIEF IN SUPPORT OF ITS MOTION
FOR JUDGMENT THAT THE CLAIMS OF THE
'452 PATENT ARE IMPLIEDLY LICENSED TO ABBOTT**

OF COUNSEL:

Ellisen Shelton Turner
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA  90067
(310) 552-4200

Amanda J. Hollis
Gregory B. Sanford
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 862-2000

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
rsmith@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Defendants*

Benjamin A. Lasky
Ashley Ross
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
(212) 446-4800

Jason M. Wilcox P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000

Leland G. Hansen
James M. Hafertepe
Sharon A. Hwang
Michael J. Carrozza
Manuela Cabal
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, IL  60661
(312) 775-8000

September 8, 2023

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................................. 3

NATURE AND STAGE OF THE PROCEEDINGS ................................................................. 4

SUMMARY OF ARGUMENT ............................................................................................. 5

STATEMENT OF FACTS ................................................................................................... 6

     A.    DexCom's Sealing Member Patents ............................................................. 6

          1.    The '282 Patent ............................................................................ 6

          2.    The '452 Patent ............................................................................ 7

LEGAL STANDARDS ....................................................................................................... 8

ARGUMENT ..................................................................................................................... 9

I.     THE '452 PATENT CLAIMS TAKE BACK THE '282 PATENT RIGHTS DEXCOM EXPRESSLY LICENSED TO ABBOTT ...................................................... 10

II.    ABBOTT DID NOT CONTRACT AWAY ITS IMPLIED LICENSE RIGHTS TO THE '452 PATENT ...................................................................................... 16

CONCLUSION ................................................................................................................. 18

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*AMP Inc. v. United States*,
  389 F.2d 448 (1968)............................................................................................6

*Cheetah Omni LLC v. AT&T Servs., Inc.*,
  949 F.3d 691 (Fed. Cir. 2020)........................................................................ *passim*

*De Forest Radio Telephone & Telegraph Co. v. United States*,
  273 U.S. 236 (1927)............................................................................................6

*Gen. Protecht Grp., Inc. v. Leviton Mfg. Co.*,
  651 F.3d 1355 (Fed. Cir. 2011)........................................................................3, 7

*Intel Corp. v. Negotiated Data Sols., Inc.*,
  703 F.3d 1360 (Fed. Cir. 2012).............................................................2, 7, 15, 16

*Lucent Techs., Inc. v. Newbridge Networks Corp.*,
  168 F. Supp. 2d 181 (D. Del. 2001)........................................................................7

*MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*,
  687 F.3d 1377 (Fed. Cir. 2012)........................................................................8

*Motorola, Inc. v. Analog Devices, Inc.*,
  2004 WL 5633740 (E.D. Tex. Aug. 10, 2004) .........................................14, 15, 16

*Regents of the University of Minn. v. Gilead Scis., Inc.*,
  61 F.4th 1350 (Fed. Cir. 2023) .....................................................................11, 12

*TransCore, LP v. Elec. Transaction Consultants Corp.*,
  563 F.3d 1271 (Fed. Cir. 2009).................................................................... *passim*

*Wang Lab'ys, Inc. v. Mitsubishi Elecs. Am., Inc.*,
  103 F.3d 1571 (Fed. Cir. 1997).....................................................................3, 6, 7

**Statutes**

35 U.S.C. § 120............................................................................................11, 12

# INTRODUCTION[1]

This case illustrates why implied licenses exist.  DexCom expressly granted Abbott a license to DexCom's U.S. Patent No. 8,615,282—a "sealing member" patent—among others.  By granting Abbott this license as part of a larger settlement, DexCom gave up its right to exclude Abbott from selling FreeStyle Libre products that embody the sealing member technology the '282 patent claims.  But after Abbott dismissed several lawsuits and gave DexCom a cross-license for this benefit, DexCom took back the very thing it licensed by obtaining U.S. Patent No. 10,980,452—a continuation of the '282 patent bearing a new number but containing an identical specification and overlapping claims.  DexCom then sued Abbott, attempting to exclude Abbott from selling the same FreeStyle Libre products embodying the same sealing member technology that it had already licensed to Abbott.  The law does not allow DexCom to grant an express license with one hand, and take back those same rights with the other.

As it must, given the overlap between the patents, DexCom has now "totally admit[ted]" that because the '282 patent is expressly licensed, "the '452 patent is going to be implied with a license" "unless there's something in the [Settlement and License Agreement ("SLA")] that's clear as a bell that [Abbott] do[es] not have [an] implied license [to the '452 patent]."  (Trial Tr. 780:3-781:23.)  That admission is dispositive.  Nothing in the SLA says Abbott does not have an implied license to the '452 patent.  DexCom cites the SLA's generic "exclu[sion]" of "continuations" from the express definition of "DexCom Licensed Patents."  That does not contain the "clear mutual intent" to avoid operation of legal estoppel that DexCom needs it to contain.  (*See* JTX-1, ¶A.13.)  Like the similar provision the Federal Circuit addressed in *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271 (Fed. Cir. 2009), this exclusionary language "protect[s] []

---

[1]     "Abbott" refers to Abbott Diabetes Care Inc. and Abbott Diabetes Care Sales Corp.  "DexCom" is DexCom, Inc.

against broad claims that [all continuations] generally are impliedly licensed," but it "does not permit [a patent owner] to derogate from the rights it has expressly granted" by filing continuations claiming overlapping subject matter. *Id.* at 1279.

Abbott never agreed that DexCom could have that unilateral power to strip Abbott of its bargained-for rights to practice the invention claimed in the expressly licensed '282 patent. As the Federal Circuit has held, courts should not lightly interpret a contract to "allow the unilateral act of the licensor to place the licensee … in a position of being exposed to further risk relating to the same exact inventions that were subject to the license." *Intel Corp. v. Negotiated Data Sols., Inc.*, 703 F.3d 1360, 1367 (Fed. Cir. 2012). That is the interpretation and result that DexCom would have the Court reach. The Court should enforce Abbott's implied license to the '452 patent to avoid that result.

## NATURE AND STAGE OF THE PROCEEDINGS

Three months after the parties' mutual covenant not to sue expired, DexCom sued Abbott for allegedly infringing the '452 patent and four other DexCom patents. (D.I. 1.) Abbott subsequently sued DexCom for breaching the SLA by, among other things, asserting that Abbott infringed licensed patents. (C.A. No. 21-1699-KAJ, D.I. 2.) The two cases were consolidated after DexCom's infringement action was transferred from the Western District of Texas, and the Court stayed DexCom's infringement claims pending resolution of Abbott's license defense. (*See* D.I. 176, ¶¶ 1-2.) The Court held a four-day trial on the license defense in July 2023.

DexCom argued that the Court, and not the jury, should hear Abbott's implied license defense. To reach this result, DexCom filed a letter brief mid-trial conceding that "Section A.13(b) of the SLA licenses certain patents to Abbott, including the '282 Patent. The '452 Patent at issue in this trial is a continuation of the '282 patent. Absent party intent to the contrary, a license to a continuation of a licensed patent will be implied unless the parties' agreement evinces an intent to

the contrary. . . . T he only question then is whether the parties expressed a 'clear mutual intent' to exclude this ['452 patent] [] from the scope of the license."  (D.I. 553 at 2.)

In light of DexCom's concessions, the Court decided the jury would resolve Abbott's express license claims but that implied license is a legal question for the Court to resolve.  (Trial Tr. 781.)  The Court instructed Abbott to make its implied-license arguments post-trial.  (*Id.*).  The jury found that Abbott has an express license to claims 1, 7, 19, and 23 of the '452 patent (and claim 1 of U.S. Patent No. 10,702,215), but that other claims of the '452 patent (10, 11, 14, 19, 23, 26-27, 41, 45, 48-49, 62-63, and 67-68) were not expressly licensed.  (D.I. 563 at 2.)  The jury also found the sensors and components used with those sensors in the FreeStyle Libre 14-day and FreeStyle Libre 2 were licensed "ADC Products" under the SLA.  (*Id.* at 3.)  Abbott now seeks a judgment that it has an implied license to the claims of the '452 patent (claims 10, 11, 14, 19, 23, 26-27, 41, 45, 48-49, 62-63, and 67-68).

## <u>SUMMARY OF ARGUMENT</u>

1.      By asserting the '452 patent claims at issue against Abbott, DexCom seeks to derogate from the express rights granted to Abbott under the license to the '282 patent, by taking back subject matter that was licensed through the '282 patent.  Legal estoppel prevents DexCom from derogating and detracting from Abbott's license rights in this way, and provides an implied license to Abbott to those '452 patent claims under these circumstances.  *See, e.g.*, *Cheetah Omni LLC v. AT&T Servs., Inc.*, 949 F.3d 691, 695–96 (Fed. Cir. 2020); *Gen. Protecht Grp., Inc. v. Leviton Mfg. Co.*, 651 F.3d 1355, 1361 (Fed. Cir. 2011); *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1278–79 (Fed. Cir. 2009); *Wang Lab'ys, Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1581 (Fed. Cir. 1997).

2.      DexCom's counterargument fails.  Nothing in the SLA suggests a "clear mutual intent" to avoid the operation of "legal estoppel" and exclude the claimed subject matter of the

'452 patent from the license to Abbott.   At most, DexCom shows an intent not to have *all*
continuations and other related patents automatically meet the definition of expressly licensed
DexCom patents without a further showing.   That does not permit DexCom to detract from the
rights it expressly granted Abbott. *See TransCore*, 563 F.3d at 1278–79.  DexCom's interpretation,
if accepted, would mean that Abbott clearly and intentionally agreed that DexCom could re-patent
and exclude Abbott from using the exact same inventions it licensed to Abbott.  DexCom's position
is unreasonable, and certainly not one that the Court should adopt "as a matter of law."

<u>STATEMENT OF FACTS</u>

**A.      DexCom's Sealing Member Patents**

**1.      The '282 Patent**

DexCom granted Abbott a license to its patents claiming priority to pre-2005 patents and
applications, and the '282 patent claims priority to several of those pre-2005 patents and
applications.  (JTX-1, ¶ A.13(b); PTX-121, Cover.)  As DexCom admits, "Section A.13(b) of the
SLA licenses certain patents to Abbott, including the '282 Patent."  (D.I. 553 at 2.)

The '282 patent describes and claims a sealing member that seals an analyte sensor from
moisture. Claim 1 of the '282 patent is the broadest independent claim and is representative of the
claimed invention:

> **1.** A device for use in measuring an analyte in a host, the device comprising:
>
> a sensor operably connected to sensor electronics configured for measuring an
> analyte in a host;
>
> at least one electrical contact configured to operably connect the sensor to the
> sensor electronics;
>
> a housing adapted for placement adjacent to the host's skin; and
>
> a sealing member configured to at least partially surround the at least one electrical
> contact, wherein the sealing member is configured to seal the at least one electrical
> contact from moisture by a compression force between the sealing member and the
> at least one electrical contact when the sensor is operably connected to the sensor

electronics, wherein the sealing member is held on the housing by at least one protrusion configured to substantially mate with at least one depression.

(PTX-121, claim 1.)  Several dependent claims add additional requirements and illustrate the breadth of devices captured by claim 1.  Claim 2, for instance, specifies the durometer hardness of the sealing member.  (*Id.*, claim 2.)  Claim 6 adds that the sealing member "comprises a sealant." (*Id.*, claim 6.)  Claims 7 and 9 additionally recite that the sealing member comprises "at least one raised portion configured to form an interference fit between the sealing member and the sensor electronics" (*id.*, claim 7), with the "at least one raised portion [] configured to surround each of the at least one electrical contacts" (*id.*, claim 9).

### 2. The '452 Patent

DexCom filed the '452 patent as a "continuation" of the '282 patent.  (JTX-8, Cover.)  The specifications of the '282 and '452 patents are identical.  The inventors of the '282 patent are also the inventors of the '452 patent.  Both patents describe an analyte sensor and sealing member with the same features and include the same figures.  For example, Figures 3, 4A and 11B in both patents depict identical sealing-member designs:

| '282 Patent | '452 Patent |
|---|---|
|  |  |

7

(PTX-121, Figs. 3, 4A, 11B; JTX-8, Figs. 3, 4A, 11B.)

The claims are remarkably similar as well and substantially overlap.  The '452 patent does not claim any new sealing member features that the '282 patent does not disclose; as a continuation, it could not.  When asked to justify the claimed priority date for the '452 patent asserted claims, DexCom in fact pointed to disclosures from U.S. App. No. 11/360,262, the application for the '282 patent.  (*See* PTX-3551 (DXC Resp. to Abbott's 1st Set of Interrogs.), Ex. C (Priority Claim Chart for the '452 Patent).)  In some instances, the '452 patent simply uses different terminology for the same claim element, such as calling the '282 patent's "protrusions" and "depressions" "male-female mechanical structures," and the '282 patent's "raised portions" a "raised ridge."  These are distinctions without a difference.

## LEGAL STANDARDS

An implied license is a complete defense to infringement.  *See De Forest Radio Telephone & Telegraph Co. v. United States*, 273 U.S. 236, 241 (1927).  A patentee can confer an implied license on others in a number of ways, including through legal estoppel.  *See Wang Lab'ys*, 103 F.3d at 1580.  "Legal estoppel refers to a … category of conduct encompassing scenarios where a patentee has licensed or assigned a right, received consideration, and then sought to derogate from the right granted."  *Id.* at 1581.  The implied license defense and the legal presumption that goes along with it more broadly reflect the common-sense principle that a patent owner cannot "tak[e] back in any extent" rights it previously granted.  *Transcore*, 563 F.3d at 1279; *see also AMP Inc. v. United States*, 389 F.2d 448, 452 (1968); *Cheetah Omni*, 949 F.3d at 969; *Wang Labs.*, 103 F.3d at 1580.

Patent claims "take back" and derogate from an express license through the claims of a continuation to the extent those claims would limit the licensee's right to practice the full scope of

8

the expressly licensed claims and regardless of whether those claims are broader, narrower, or simply overlap. *See Cheetah Omni*, 949 F.3d at 696 ("different invention from or narrower than" expressly licensed patent); *General Protecht*, 651 F.3d at 1361 (narrower); *Transcore*, 563 F.3d at 1279 (broader). The law presumes an implied license exists—and a patent owner is legally estopped from taking back rights it expressly granted—where a "continuation[] issue[s] from parent patents that previously have been licensed as to certain products." *Gen. Protecht*, 651 F.3d at 1361; *see also Intel Corp. v. Negotiated Data Sols., Inc.*, 703 F.3d 1360, 1366 (Fed. Cir. 2012). This legal presumption can be overcome only by "a clear indication of mutual intent to the contrary." *Gen. Protecht*, 651 F.3d at 1361; *Cheetah Omni*, 949 F.3d at 695-96.

The existence of an implied license based on legal estoppel is a question of law based on underlying factual findings. *See Wang Lab'ys*, 103 F.3d at 1578-59; *Lucent Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 240 (D. Del. 2001).

## ARGUMENT

The Court should enter judgment that Abbott has an implied license to claims 1, 7, 10, 11, 14, 19, 23, 26-27, 41, 45, 48-49, 62-63, and 67-68 of the '452 patent. Absent an implied license to the '452 patent, DexCom would take back rights it expressly licensed given the overlap between the '282 and '452 patent claims. DexCom does not contest and cannot avoid this conclusion. In arguing against a jury trial on this defense, DexCom represented that there was only one open question: "whether the parties expressed a 'clear mutual intent' to exclude this ['452 patent] [] from the scope of the license." (Trial Tr. 779-782; D.I. 553 at 2.) The answer to that question is no.

## I.   THE '452 PATENT CLAIMS TAKE BACK THE '282 PATENT RIGHTS DEXCOM EXPRESSLY LICENSED TO ABBOTT

DexCom should not be opposing this motion based on any argument that the '452 patent claims do not take away from Abbott's license to the '282 patent.  To argue "the overlap between licensed claims of the '282 patent and claims of the '452[] is irrelevant," and resist Abbott's request for a jury trial on Abbott's implied license defense, DexCom conceded that its position that the SLA expressed a "clear intent" to exclude the '452 patent was the only question.  (Trial Tr. 781:8-23.)

Moreover, Abbott's expert, Dr. Schurman, mapped the elements of the '452 patent claims to the corresponding claim elements in the '282 patent on a claim-by-claim basis, showing their overlap and how an implied license to the '452 patent would be needed to practice the full scope of Abbott's '282 patent license.  (Ex. 5 (Schurman Decl. ¶ 2, Ex. A).)  Dr. Gall, DexCom's expert, did not dispute Dr. Schurman's analysis for the claims at issue here beyond offering the irrelevant observation that claim 1 of the '282 patent "does not disclose a second material with a higher durometer hardness."  (Ex. 6 (Gall Rebuttal Rpt.), ¶ 284; *see also generally id.*, ¶¶ 281-285.)  The specification of the '282 patent describes this feature (PTX-121 at 6:21-35), and in a comprising claim, silence about the relative durometer hardness means the claim covers devices where the electrical contact is harder than the sealing member, devices where the sealing member is harder than the electrical contact, and devices where the components are equally hard.  *See MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1383 (Fed. Cir. 2012) ("The transition 'comprising' creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements.").

The other differences in the claim language of the '282 and '452 patents are equally irrelevant.  Claim 1 of the '282 patent broadly claims a sealing member that partially surrounds an

electrical contact using "a compression force" and that is held in place by "protrusion[s]" that mate with corresponding "depression[s]" on a sensor housing:

> **1.** A device for use in measuring an analyte in a host, the device comprising:
>
> a sensor operably connected to sensor electronics configured for measuring an analyte in a host;
>
> at least one electrical contact configured to operably connect the sensor to the sensor electronics;
>
> a housing adapted for placement adjacent to the host's skin; and
>
> a sealing member configured to at least partially surround the at least one electrical contact, wherein the sealing member is configured to seal the at least one electrical contact from moisture by a compression force between the sealing member and the at least one electrical contact when the sensor is operably connected to the sensor electronics, wherein the sealing member is held on the housing by at least one protrusion configured to substantially mate with at least one depression.

(PTX-121, Claim 1.)

Claim 1 of the '452 patent recites a similar, but in many respects narrower, device for measuring glucose levels. Both claim 1 of the '452 patent and the claims of the '282 patent require a sensor operably connected to sensor electronics, an electrical contact that would be held in a contact holder, and a sealing member that partially surrounds and seals the electrical contact from moisture. (*Compare* PTX-121 at 117:28-44, 118:27-43, *with* JTX-8 at 119:63-120:19.) Claim 1 of the '452 patent adds that the electrical contact must have a higher durometer hardness than the sealing member, but neither that requirement nor any other language in the claim take the device recited in claim 1 of the '282 patent outside the scope of claim 1 of the '452 patent. The claims of the '282 patent place no restrictions on the relative hardness of the electrical contact and sealing member; it covers all iterations of relative hardness. (*See* PTX-121 at 117:28-118:46.)

Abbott thus needs an implied license to claim 1 of the '452 patent to practice the full scope of the expressly licensed claims of the '282 patent. The same is true for the remaining claims of the '452 patent. Each of those claims is narrower than claim 1 of the '452 patent, and like that

claim, adds no requirements that would exclude the devices the '282 patent claims recite. Quite the opposite. Many of the additional elements recited in the '452 patent appear in the claims of the '282 patent, further confirming the broad independent claim 1 of the '282 patent encompasses the same subject matter the '452 patent claims.

**Male-Female Mechanical Structures.** Certain claims of the '452 patent recite that "the sealing member is held at least in part on the contact holder by mating male-female mechanical structures on the contact holder and on the sealing member." (JTX-8, claims 10, 26, 48, 62 *et seq.*) But that feature was already claimed by the '282 patent, and therefore licensed to Abbott. Specifically, claim 1 of the '282 patent recites that "the sealing member is held on the housing ***by at least one protrusion configured to substantially mate with at least one depression***." (PTX-121, claim 1.) It is undisputed that a "protrusion" is a "male" mechanical structure, while a "depression" is a "female" mechanical structure. (*See* Trial Tr. 1113-1114 (DexCom's expert Dr. Gall describing male-female mechanical structures as including a "depression [that] is configured to receive [a] mating protrusion.").) Further, as the '282 patent describes, the "housing" of the system, also known as the "mounting unit" (PTX-121 at 23:19-27) includes the "contact holder," which may be "integrally designed" as a part of it (*id.* at 28:13-17).

Were there any doubt, the only mention in the '282 patent specification of an embodiment with "protrusions" and "depressions" is the one depicted in Figure 4D:



(PTX-121 at 29:45-60, Fig. 4D; *see also* JTX-8, Fig. 4D.)  DexCom's expert, Dr. Gall, testified at

trial that this same figure depicts male-female structures to hold the sealing member on the contact

holder.  (Trial Tr. 1113-1114.)  In its interrogatory responses, DexCom likewise relied on the same

description and illustration of "depressions" and "mating protrusions" to support its contention

that claims of the '452 patent reciting male-female mechanical structures could claim priority back

to the '282 patent.  (PTX-3551, Ex. C at 32 (claim 10), 66 (claim 26), 106 (claim 48), 108-33

(claim 62).)  For a later-filed patent to receive the benefit of the priority date of an earlier-filed

application, the earlier application must provide "a full, clear, concise and exact description" of

the invention claimed in the later-filed patent.  *Regents of the University of Minn. v. Gilead Scis.,*

*Inc.*, 61 F.4th 1350, 1356 (Fed. Cir. 2023); *see also* 35 U.S.C. § 120.  By pointing to the disclosure

of the depressions and protrusions in the '282 patent's application to support its priority claim for

the male-female structures in the '452 patent, DexCom thus acknowledged the two features are the

same.  Having made the argument for priority purposes that the structures are the same, DexCom

cannot now argue for implied-license purposes that the structures are different.

**Raised Ridge.**  Other claims of the '452 patent recite that "the sealing member comprises

a raised ridge to improve a seal around the electrical contact."  (JTX-8, claims 11, 27, 49.)  But

claim 1 of the '282 patent already covers a sealing member with a raised ridge, as confirmed by

the dependent claims of the '282 patent.  Claim 9 of the '282 patent, which depends from claims 1

13

and 7, recites a sealing member with "at least one raised portion configured to form an interference fit between the sealing member and the sensor electronics" and "configured to surround each of the at least one electrical contacts." (PTX-121, claims 7, 9.) The '282 patent describes these "raised portions" as "ridges" and states the raised portions "improve the seal formed around the contacts 28." (PTX-121 at 26:22-31.) DexCom again relied on these same disclosures describing raised portions to support its priority claims for the "raised ridge" limitations in the '452 patent, (PTX-3551, Ex. C at 32-33 (claim 11), 66-67 (claim 27), and 106-107 (claim 49))—an admission that confirms that Abbott's express license to sealing members with raised portions confers an implied license to sealing members with raised ridges, *see* 35 U.S.C. § 120; *Gilead*, 61 F.4th at 1356.

**Sandwiched Sensor.** Another set of '452 patent claims require a "sealing member [that] comprises an upper portion and a lower portion, wherein an ex vivo portion of the transcutaneous analyte sensor is sandwiched between the upper portion and the lower portion." (JTX-8, claims 14, 19, 68.) Claim 41 similarly recites that "an ex vivo portion of the transcutaneous glucose sensor is positioned between the sealing member upper portion inner face and the sealing member lower portion inner face." (*Id.*, claim 41.) Nothing in the broad language of claim 1 of the '282 patent excludes a sensor sandwiched within the sealing member in this way.

Dependent claim 6 of the '282 patent further recites a sensor sealed through sandwiching. That claim recites a "sealing member [that] comprises a sealant." (PTX-121, claim 6.) When describing how to create such a sealing member comprising sealant, the '282 patent states that Figure 4H shows "sealing member upper portion 408" and "sealing member lower portion 410" being "configured to ***sandwich*** the sensor ***and sealant*** (*e.g.*, grease) therebetween":



(*Id.* at 30:51-63, Fig. 4H; *see also* JTX-8, Fig. 4H.)  DexCom's expert, Dr. Gall, testified at trial that this same figure depicts sandwiching of the sensor as recited in the '452 patent claims.  (Trial Tr. 1092-1094.)  And in a familiar pattern, DexCom relied on that disclosure to support its priority claim for the "sandwiching" elements in the '452 patent.  (PTX-3551, Ex. C at 34-35 (claim 14), 36-60 (claim 19), 67-100 (claim 41), 139-140 (claim 68).)

**Other Aspects Of Claim 41**.  Claim 41 of the '452 patent is even narrower.  That claim recites not just a sensor sandwiched within the sealing member but also that the upper and lower portions of the sealing member each have an "inner face" and an "outer face" and that the upper portion must have "one or more holes therethrough, wherein each of the one or more holes extends from a respective opening in the outer face of the sealing member upper portion to a respective opening in the inner face of the sealing member upper portion."  (JTX-8, claim 41.)  These elements are nothing new and fall within the scope of '282 patent claim 1.  These additional elements were already part of the "sealant" configuration shown in Figure 4, claimed in dependent claim 6, and relied on by DexCom to support its priority date for these claim elements.  (PTX-121, 30:51-63, Fig. 4H, claim 6; PTX-3551, Ex. C at 80-98.)

*       *       *

As these examples from the dependent claims illustrate, the allegedly licensed claims of the '452 patent cover devices that fall within the scope of the '282 patent claims.  DexCom cannot take back through the '452 patent what it expressly licensed through the '282 patent.  Rather, "to obtain the benefit of [the] bargain with [DexCom]" memorialized in the SLA, Abbott "must be permitted to practice the ['452 patent] to the same extent it may practice the" expressly licensed '282 patent claims.  *TransCore*, 563 F.3d at 1279.

## II.   ABBOTT DID NOT CONTRACT AWAY ITS IMPLIED LICENSE RIGHTS TO THE '452 PATENT

The SLA nowhere reflects a "clear mutual intent" that DexCom could claw back the rights it expressly licensed through subsequent continuations containing claims that overlap with and are needed to practice the full scope of the expressly licensed patents. *Cheetah Omni*, 949 F.3d at 695-96. In arguing otherwise, DexCom relies on the following language of the SLA, in the definition of "DexCom Licensed Patents," which provides that:

> Continuations, continuations-in-part, divisionals and other patents claiming priority to the patents captured in subsection [A.13](b), but not claiming priority to any of the patents or patent applications captured in subsection [A.13](a), are excluded from the definition of DexCom Licensed Patents, except to the extent they have claims that satisfy the requirements of subsection [A.13](c).

(JTX-1, ¶A.13.) But that language at most protects "against broad claims that future patents generally are impliedly licensed."  *TransCore*, 563 F.3d at 1279.  Abbott thus may not have an implied license to all continuations of the '282 patent, such as U.S. Patent No. 10,709,362, that claims unrelated and fundamentally different subject matter.  (*See* Ex. 7, claim 1 (claiming a CGM with "a processor configured to calibrate the sensor data based on predetermined calibration information").)  The language DexCom relies on does not, however, clearly and unambiguously "permit [DexCom] to derogate from the rights it has expressly granted" by filing a continuation that claims the same subject matter.  *TransCore*, 563 F.3d at 1279.  The law puts the burden on

DexCom to clearly express that intent in the SLA both because DexCom has the best information about what patents it may seek in the future and because Abbott is unlikely to agree to an express license that could be so easily circumvented by future continuations.  *See Cheetah Omni*, 949 F.3d at 696 ("The expectation is properly placed on the patent owner … to specifically carve out continuation patents that it intended to exclude.").

DexCom's interpretation of the SLA, in contrast, would grant DexCom the unilateral power to take back the rights it expressly licensed simply by filing continuations with carefully curated priority chains.  Courts have consistently refused to read licensing agreements to give patent owners that unilateral power absent extraordinarily clear and unambiguous language.  In *Motorola, Inc. v. Analog Devices, Inc.*, for instance, the court rejected Analog Devices' argument that its licensing agreement permitted Analog Devices to "strip[] Motorola of its rights" and "capriciously disavow[]" the licenses it granted "by the filing of continuation applications."  2004 WL 5633740, *3-4 (E.D. Tex. Aug. 10, 2004).  The court found that no "fair and reasonable interpretation of the agreement" would suggest Analog Devices "could, by the simple subterfuge of filing a continuation application, weasel out of [its] agreement."  *Id.*  Similarly, in *Intel*, the Federal Circuit refused to read a license agreement to contract around an implied license in a way that "would allow the unilateral act of the licensor"—there, obtaining a reissued patent—"to place the licensee … in a position of being exposed to further risk relating to the same inventions that were subject to the license."  703 F.3d at 1367.  The SLA does not speak with the clarity necessary to adopt that otherwise unreasonable interpretation here either because that was never the parties' intent.

DexCom's position that "Abbott's implied license argument renders the A.13(c) limitations as superfluous and extends the license to all patents that are continuations from A.13(b)

patents" should be rejected for similar reasons.  D.I. 553 at 3.  Abbott is not arguing for an implied license to all continuations of the expressly licensed patents or even all patents that are expressly licensed under ¶ A.13(b).  None of the SLA's limitations are rendered superfluous by an implied license to continuations *that derogate from Abbott's expressly licensed patent rights*.

This case is thus indistinguishable from *TransCore*.  The license in that case included an even more sweeping limit on the scope of its license than the SLA.  *TransCore*, 563 F.3d at 1273.  After listing certain expressly licensed patents by number, the parties' agreement provided that "[t]his Covenant Not To Sue shall not apply to ***any*** other patents issued as of the effective date of this Agreement or to be issued in the future."  *Id.*  TransCore argued this language disclaimed any implied license to continuations of the expressly licensed patents.  The Federal Circuit disagreed, holding that this language may mean "future patents generally are [not] impliedly licensed, but it does not permit TransCore to derogate from the rights it has expressly granted."  *Id.* at 1279.  Nothing in principle or precedent warrants a different result here.  As in *Motorola*, *Intel*, and *TransCore*, Abbott has an implied license to the relevant claims of the '452 patent that is at least co-extensive with its express license to make, use, and sell the inventions claimed in the '282 patent.

## **CONCLUSION**

Judgment should be entered that Abbott has an implied license to claims 1, 7, 10-11, 14, 19, 23, 26-27, 41, 45, 48-49, 62-63, and 67-68 of the '452 patent.

OF COUNSEL:

Ellisen Shelton Turner
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA  90067
(310) 552-4200

Amanda J. Hollis
Gregory B. Sanford
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 862-2000

Benjamin A. Lasky
Ashley Ross
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
(212) 446-4800

Jason M. Wilcox P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC  20004
(202) 389-5000


September 8, 2023

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

_____
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
rsmith@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Defendants*


Leland G. Hansen
James M. Hafertepe
Sharon A. Hwang
Michael J. Carrozza
Manuela Cabal
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, IL  60661
(312) 775-8000

19

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on September 8, 2023, upon the following in the manner indicated:

John W. Shaw, Esquire                                    *VIA ELECTRONIC MAIL*
Andrew E. Russell, Esquire
Nathan R. Hoeschen, Esquire
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Plaintiff*

Nathan Hamstra, Esquire                                  *VIA ELECTRONIC MAIL*
Jonathon Studer, Esquire
QUINN EMANUEL URQUHART & SULLIVAN LLP
191 North Wacker Drive, Suite 2700
Chicago, IL  60606
*Attorneys for Plaintiff*

Valerie Lozano, Esquire                                  *VIA ELECTRONIC MAIL*
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA  90017
*Attorneys for Plaintiff*

Cary E. Adickman, Esquire                                *VIA ELECTRONIC MAIL*
Brian P. Biddinger, Esquire
QUINN EMANUEL URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010
*Attorneys for Plaintiff*

David Bilsker, Esquire                                   *VIA ELECTRONIC MAIL*
QUINN EMANUEL URQUHART & SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, CA  94111
*Attorneys for Plaintiff*

Kevin P.B. Johnson, Esquire                          *VIA ELECTRONIC MAIL*
Margaret Shyr, Esquire
Todd M. Briggs, Esquire
Cat Williams, Esquire
Zak Randell, Esquire
QUINN EMANUEL URQUHART & SULLIVAN LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA  94065
*Attorneys for Plaintiff*

Gavin Frisch, Esquire                                *VIA ELECTRONIC MAIL*
QUINN EMANUEL URQUHART & SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, MA  02119
*Attorneys for Plaintiff*

Theodore Kwong, Esquire                              *VIA ELECTRONIC MAIL*
HILGERS GRABEN PLLC
10000 North Central Expy., Suite 400
Dallas, TX  75231
*Attorneys for Plaintiff*

Sophie A. Hood, Esquire                              *VIA ELECTRONIC MAIL*
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA  94111-1809
*Attorneys for Plaintiff*


                                        */s/ Rodger D. Smith II*

                                        _____
                                        Rodger D. Smith II (#3778)