IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DEXCOM, INC., ) | **Redacted - Public Version** |
| ) | |
| Plaintiff, ) | |
| v. ) | C.A. No. 22-605-KAJ |
| ) | **CONSOLIDATED** |
| ABBOTT DIABETES CARE INC. and ) | |
| ABBOTT DIABETES CARE SALES CORP., ) | ███████████████ |
| ) | |
| Defendants. ) | |
| ) | |
| ABBOTT DIABETES CARE INC. ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | C.A. No. 21-1699-KAJ |
| ) | |
| DEXCOM, INC., ) | |
| ) | |
| Defendant. ) | |

**DEXCOM INC.'S OPENING BRIEF IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

OF COUNSEL:
David Bilsker
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(213) 443-3000

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for DexCom, Inc.*

Kevin P.B. Johnson
Todd M. Briggs
Margaret Shyr
Sara L. Pollock
Zak Randell
Cat Williams
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
(650) 801-5000

Brian P. Biddinger
Cary E. Adickman
Alex Zuckerman
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Nathan Hamstra
Jonathon Studer
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400

Valerie Lozano
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Isabel Peraza
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
1300 I St. NW #900,
Washington, DC 20005
(202) 538-8000

Gavin Frisch
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
111 Huntington Ave., Suite 520
Boston, MA 02119
(617) 712-7100

Trevor J. Quist
QUINN EMANUEL URQUHART
  & SULLIVAN LLP
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
(801) 515 7300

Theodore Kwong
HILGERS GRABEN PLLC
10000 N. Central Expy., Suite 400
Dallas, TX 75231
(972) 645-3097

Sophie A. Hood
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA  94111-1809
(415) 391-5400

Dated: September 8, 2023

## <u>TABLE OF CONTENTS</u>

<u>Pages</u>

I.      NATURE AND STAGE OF PROCEEDINGS ....................................................................1

II.     SUMMARY OF ARGUMENT ..........................................................................................1

III.    LEGAL STANDARDS ......................................................................................................2

IV.     STATEMENT OF FACTS AND ARGUMENT .................................................................3

      A.      There Was Insufficient Evidence To Support A Verdict That Claim 1 Of
           The '215 Patent Is "Fully Supported And Enabled" By A Pre-2005
           DexCom Patent Or Patent Application. ...................................................................3

           1.      Abbott Failed To Present Sufficient Evidence That The '549 Patent
                  Taught A Predictive Function With A Fixed Threshold............................4

           2.      Abbott Failed To Present Sufficient Evidence That The '549 Patent
                  Taught Claim 1 Of The '215 Patent As An Integrated Whole. ..................7

           3.      The Testimony Of Abbott's Fact Witnesses Was Not Tied To A
                  Pre-2005 DexCom Patent Or Patent Application. .......................................8

      B.      There Was Insufficient Evidence To Support A Verdict That Claims 1, 7,
           19, And 23 Of The '452 Patent Are "Fully Supported And Enabled" By A
           Pre-2005 DexCom Patent Or Patent Application. ..................................................10

           1.      There Was Insufficient Evidence To Conclude That The '683
                  Provisional Fully Supported The "Relative Durometer Hardness"
                  Limitation Of Claims 1 And 7. ..................................................................10

           2.      There Was Insufficient Evidence To Conclude That The '683
                    Provisional Fully Supported And Enabled The "Sandwich"
                  Limitation Of Claims 19 And 23. ............................................................13

      C.      DexCom Did Not Breach The Dispute Resolution Clause. ...................................16

      D.      Freestyle Libre Products With Readers With Integrated Blood Glucose
           Meters Are Not "ADC Products" .........................................................................18

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Asterias Biotherapeutics, Inc. v. Viacyte, Inc.*,
  2014 WL 93903 (N.D. Cal. Jan. 9, 2014) ............................................................ 9

*Fireman's Fund Ins. Co. v. Videfreeze Corp.*,
  540 F.2d 1171 (3d Cir. 1976) ............................................................................ 2

*Flash-Control, LLC v. Intel Corp.*,
  2021 WL 2944592 (Fed. Cir. July 14, 2021) ...................................................... 11

*In re Ruschig*,
  54 C.C.P.A. 1551 (1967) .................................................................................... 7

*Krumme v. WestPoint Stevens Inc.*,
  238 F.3d 133 (2d Cir. 2000) .............................................................................. 17

*L.P.P.R., Inc. v. Keller Crescent Corp.*,
  532 F. App'x 268 (3d Cir. 2013) ........................................................................ 17

*Lightning Lube, Inc. v. Witco Corp.*,
  4 F.3d 1153 (3d Cir. 1993) ................................................................................. 3

*Novozymes A/S v. DuPont Nutrition Biosciences APS*,
  723 F.3d 1336 (Fed. Cir. 2013) ....................................................................... 7, 11

*S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist.*,
  50 F.3d 476 (7th Cir. 1995) ............................................................................... 17

*Volvo Penta of the Americas, LLC v. Brunswick Corp.*,
  2023 WL 5440530 (Fed. Cir. Aug. 24, 2023) ...................................................... 9

*Xerox Corp. v. Lantronix, Inc.*,
  342 F. Supp. 3d 362 (W.D.N.Y. 2018) ............................................................... 18

### Statutory Authorities

35 U.S.C. § 112 .................................................................................. 10, 11, 13

### Rules and Regulations

Fed. R. Civ. P. 50(a) ............................................................................................. 1

Fed. R. Civ. P. 50(b) .......................................................................................... 1, 2

## I.   NATURE AND STAGE OF PROCEEDINGS

The Court held a jury trial on July 10-14, 2023, after which the jury returned a verdict that, *inter alia*,: (1) Abbott proved by a preponderance of the evidence that claims 1, 7, 19, and 23 (but not claims 10-11, 14, 26-27, 41, 45, 48-49, 62-63, and 67-68) of the '452 Patent are licensed to ADC Inc. pursuant to ¶A.13(c)(i) of the Settlement and License Agreement ("SLA");[1] (2) Abbott proved by a preponderance of the evidence that DexCom breached ¶H.3(i) by obtaining issuance of claim 1 of the '215 Patent; (3) Abbott proved by a preponderance of the evidence that its allegedly licensed sensors, and components used with those sensors, in the FreeStyle Libre 14-day with reader and FreeStyle Libre 2 with reader are "ADC Products" as set forth in ¶A.3 of the SLA; (4) Abbott proved by a preponderance of the evidence that DexCom breached the Dispute Resolution Clause in SLA ¶J.1; and (5) DexCom did not prove by a preponderance of the evidence that Abbott breached the Dispute Resolution Clause in SLA ¶J.1.  D.I. 563.

DexCom hereby renews its oral motions for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a), Tr. 912:12-930:5,[2] and moves for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b).

## II.   SUMMARY OF ARGUMENT

DexCom moves for judgment as a matter of law ("JMOL") with respect to Abbott's claims that DexCom breached the SLA's license, warranty and dispute resolution provisions; and the jury's finding that Abbott's allegedly licensed sensors, and components used with those sensors, in the FreeStyle Libre 14-day with reader and FreeStyle Libre 2 with reader are "ADC Products" as set forth in Section A.3 of the SLA.

---

[1]   The SLA was admitted into evidence as JTX-1.

[2]   "Tr." refers to the official jury trial transcripts, dated July 10-14, 2023.  D.I. 576-580.

1)      There is insufficient evidence to support the jury's verdict that DexCom breached Section H.3 of the SLA by obtaining the issuance of claim 1 of the '215 Patent, and that Abbott is therefore licensed to that claim, because no jury could reasonably conclude from the evidence that claim 1 of the '215 Patent is fully supported and enabled by U.S. Patent No. a pre-2005 DexCom patent or patent application.  Abbott does not have a license to that claim as a matter of law.

2)      There is insufficient evidence to support the jury's verdict that Abbott is licensed to claims 1, 7, 19, or 23 of the '452 Patent pursuant to Section A.13(c)(i) of the SLA because no jury could reasonably conclude from the evidence that those claims are fully supported and enabled by U.S. Provisional Application No. 60/614,683.

3)      There is insufficient evidence to support a jury verdict that DexCom breached the SLA's dispute resolution clause set forth in Section J.1 by filing its patent infringement case without first going through the dispute resolution process.

4)      There is insufficient evidence to support the jury's verdict that the FreeStyle Libre 14-day and Libre 2 products with readers are "ADC Products" as set forth in Section A.3 of the SLA.

## III.   LEGAL STANDARDS

Under Rule 50(b), "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a), ... the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59."  Fed. R. Civ. P. 50(b).  The standards that govern a Rule 50(b) motion "vary according to whether the movant has the burden of proof."  *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir. 1976).  Where, as here, the moving party does not have the burden of proof, judgment as a matter of law is warranted "if, viewing the evidence in the light most favorable to the nonmovant and

giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

## IV.   STATEMENT OF FACTS AND ARGUMENT

### A.   There Was Insufficient Evidence To Support A Verdict That Claim 1 Of The '215 Patent Is "Fully Supported And Enabled" By A Pre-2005 DexCom Patent Or Patent Application.

Claim 1 of the '215 Patent recites a method of activating hypoglycemic indicators and requires the combination of two functions.  JTX-7.0046, cl. 1.  The first function evaluates real time glucose values against one or more user settable first criteria.  *Id.*  The second function is a "function that provides a predictive alert/alarm," D.I. 561 at 16, and evaluates whether a parameter indicative of glucose value meets one or more "non user settable" second criteria.  JTX-7.0046, cl. 1.[3]

Abbott alleged, and the jury found, that DexCom breached SLA ¶H.3 by obtaining the issuance of claim 1 of the '215 patent, and that Abbott was therefore licensed to that claim, because the claim was fully supported and enabled by the disclosure of U.S. Patent No. 8,282,549 ("'549 Patent," PTX-415), including through the '549 patent's incorporation by reference of a non-DexCom patent, U.S. Patent No. 6,565,509 ("'509 Patent," DTX-427).  For the reasons below, there was insufficient evidence from which a reasonable jury could conclude that claim 1 of the '215 patent is fully supported and enabled by the disclosure of the '549 patent.

As the Court instructed the jury, "[t]he SLA's 'fully supported and enabled' standard invokes the U.S. legal standard for written description and enablement."  D.I. 561 at 19.  With

---

[3]  Claim 1 further requires providing an output including a first hypoglycemic indicator if the one or more user settable criteria is met and providing an output including a second hypoglycemic indicator if the one or more non user settable criteria are met.  *Id.*

respect to the legal standard for written description, the Court instructed that "[t]he written description requirement is met for a given claim if the description in at least one pre-2005 DexCom patent or patent application is sufficient to show that the inventor was in possession of the full scope of the claimed invention in that claim." *Id*. The Court further explained that the pre-2005 DexCom patent or application must be viewed from the perspective of a person of ordinary skill in the art "as of January 1, 2005," and "must describe the full scope of the claimed invention, ***including each element thereof***, either expressly or inherently." *Id*. (emphasis added).[4] Abbott failed to present sufficient evidence for the jury to conclude that the inventors of the '549 Patent— the only pre-2005 DexCom patent or patent application on which it relied—were in possession of the full scope of the invention of claim 1 of the '215 patent. And Abbott's cobbling together of disclosures from its own patent, along with Abbott witness testimony about their work on unrelated Abbott products, could not, and did not, fill that evidentiary gap.

### 1.    Abbott Failed To Present Sufficient Evidence That The '549 Patent Taught A Predictive Function With A Fixed Threshold.

Abbott failed to prove that the '549 patent disclosed a predictive alarm with a "non user settable" threshold (*i.e.*, a threshold the user is prohibited from changing). Tr. 649:2-18. The only Abbott witness who testified about alarm disclosures in the '549 Patent was Abbott's expert Dr. Steil, and his testimony was insufficient to establish that either patent disclosed a predictive alarm with a "non user settable" threshold.

Dr. Steil's testimony established that there was a consensus in the field that hypoglycemia thresholds should be user settable. In 2005, the "consensus among doctors, patients and companies" was that glucose thresholds and the alarms based on those thresholds should be user

---

[4]   Abbott did not make any inherency arguments at trial.

settable.  Tr. 652:10-653:18.[5]  Thus, a POSA would have expected a threshold to be user settable absent an express teaching to the contrary.  *See* D.I. 561 at 19 (description of pre-2005 DexCom references understood "from the viewpoint of a [POSA]" as of January 1, 2005).

Dr. Steil's testimony also established that the '549 Patent (and the '509 patent, purportedly incorporated by reference into the '549 Patent) shared that consensus view.  "[C]onsistent with the consensus in the field at the time . . . that one size doesn't fit all for hypoglycemia thresholds," Dr. Steil confirmed that "[t]he '549 also described consistent with the consensus in the field that there is no one size that fits all for . . . hypoglycemic threshold values" and that the '549 Patent's teaching of hypoglycemia thresholds of 55, 80 or 100 mg/dL "would be consistent with the consensus in the field that you want the patient, the doctor to be able to set a lower value because everyone is not the same."  Tr. 701:12-21, 702:14-18.  Dr. Steil also conceded the '509 Patent taught various options for the hypoglycemia thresholds.  Tr. 661:4-13.

Despite admitting that the user settable thresholds were ubiquitous, and the '549 and '509 patents were in line with the consensus, Dr. Steil pointed to a single sentence in each of the '549 and '509 patents to suggest that they also described an invention that is diametrically opposite from the consensus view.  Notably, the sentences he relied on to contradict the consensus are located adjacent to the provisions that he testified are consistent with the consensus that there is no one size fits all threshold.  Tr. 700-703 (discussion of '549 Patent); PTX-415.0068 at 43:33-49; Tr. 660-661 (discussion of '509 Patent); DTX-427.0056 at 45:18-31.

---

[5]  Dr. Steil was not aware of any Medtronic CGM prior to 2012 that had "an alarm or threshold that was fixed and prohibited the user from adjusting it."  Tr. 655:25-656:7.  Likewise, he agreed that "prior to 2012, even Abbott never had a product that was fixed as to the user and not user-settable or adjustable."  Tr. 656:13-16.

For his opinion that the '549 Patent taught a fixed threshold, Dr. Steil relied exclusively on the statement: "Clinical risk zones 204 can be set by a manufacturer, customized by a doctor, and/or set by a user via buttons 32, for example." Tr. 703:3-17. A teaching that the user "can" set a value cannot mean, and does not provide a written description for, the opposite—that the user is somehow prohibited from setting the value. And, given the overwhelming evidence that the consensus at the relevant time was that thresholds should be user settable (including within the '549 Patent), a statement that the user "*can*" set the risk zone does not permit a reasonable jury to conclude that the '549 Patent taught that the user *cannot* set the threshold.

Dr. Steil's analysis of the '509 Patent suffers from similar deficiencies. As a preliminary matter, the '549 Patent only references the '509 Patent for its disclosure of a "transcutaneous sensor such as described in U.S. Pat. No. 6,565,509 to Say et al." PTX-415.0056 at 20:14-16. This is insufficient to show incorporation by reference of the alarm functionality of the '509 Patent. *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) ("To incorporate material by reference, the host document must identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents"). Regardless, the disclosure of an Abbott patent cannot show that a *DexCom* "inventor was in possession of the full scope of the claimed invention." D.I. 561 at 19.

In addition, like for the '549 Patent, Dr. Steil relied on a statement that the "[t]he analyte monitor device may be configured so that the threshold levels for these or any other conditions may be programmable by the patient and/or a medical professional" and reasoned that "[w]henever I see a phrase like 'may be,' I basically automatically assume the alternate, it can be and may not be." Tr. 633:19-634:6, 666:4-22, 683:2-17. However, he changed his opinion about this statement several times, and also testified that it did not teach a fixed threshold. Tr. 686-694. Dr. Steil also

relied on a statement that "[t]he actual threshold values that are designed into the alarm system 104 may correspond to interstitial fluid glucose concentrations or electrode measurements" as teaching fixed thresholds. Tr. 631:25-633:9; DTX-427.0056 at 45:23-31. That statement suffers from the same consistency issue: Dr. Steil previously opined that this clause actually taught *user settable* thresholds. Tr. 696:1-698:3. But more importantly, given the overwhelming consensus that thresholds should be user settable (including within the '509 Patent), a statement that thresholds "are designed into the system" is not sufficient evidence for a reasonable jury to conclude that the inventors of the '549 Patent were in possession of a predictive alarm with a threshold that the user was prohibited from changing, as opposed to a threshold that, for instance, was initially set to default value but may then be modified.

### 2. Abbott Failed To Present Sufficient Evidence That The '549 Patent Taught Claim 1 Of The '215 Patent As An Integrated Whole.

Abbott also failed to show that the '549 patent taught claim 1 of the '215 Patent as "an integrated whole rather than as a collection of independent limitations." *Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1349 (Fed. Cir. 2013); D.I. 561 at 19 (patent must describe "the full scope of the claimed invention"). Abbott could not prove written description by "working backward from a knowledge of the claims" to "derive written description support from an amalgam of disclosures plucked selectively" from the earlier disclosure. *Novozymes*, 723 F.3d at 1349. If one works backward from a knowledge of the claimed combination, "that is by hindsight, it is all very clear what route one would travel through the forest of the specification to arrive at it." *In re Ruschig*, 54 C.C.P.A. 1551, 1558 (1967).

Specifically, Abbott failed to identify any disclosure in the '549 Patent (including through its purported incorporation by reference of the '509 Patent) that combined a first function (real time and user settable) with a second function (predictive and fixed). Instead, Abbott pointed to a

list of various possibilities and argued a POSA could assemble the claimed combination from that menu.  *E.g.*, Tr. 629:6-23 (Dr. Steil testifying that the Abbott '509 Patent "disclosed, again, all of the elements in the '212 [*sic*], basically realtime, predictive, user-settable and nonuser-settable"); Tr. 633:10-18 (Dr. Steil summarizing "[his] view of the '509 Abbott patent" as "the '509 has talked about realtime alarms.  It's talked about predictive alarms and it's talked about the attributes of those lines being the attributes of those alarms, if you like, being user-settable or nonuser-settable").  Essentially, Abbott argued that claim 1 of the '215 Patent would have been obvious in view of the teachings of the '549 Patent, '509 Patent, and other knowledge of a person of ordinary skill in the art.  That is not the standard that the jury was required to apply.  D.I. 561 at 19-21.  Accordingly, Abbott failed to present sufficient evidence for a reasonable jury to conclude that claim 1 of the '215 Patent as a whole was "fully supported and enabled" by a pre-2005 DexCom patent or patent application.

### 3.    The Testimony Of Abbott's Fact Witnesses Was Not Tied To A Pre-2005 DexCom Patent Or Patent Application.

Abbott offered fact witness testimony regarding alarms in the Abbott FreeStyle Navigator from two employees, Dr. Taub and Mr. Harper.  Their testimony about work that Abbott confidentially did prior to January 1, 2005, cannot supply adequate written description because a pre-2005 *DexCom patent or application* must itself "describe the full scope of the claimed invention, including each element thereof." D.I. 561 at 19; *see Biogen v. Int'l GmbH v. Mylan Pharm. Inc.*, 18 F.4th 1333, 1341–42 (Fed. Cir. 2021).   Abbott cannot fill gaps in the pre-2005 DexCom patent or application's disclosure with the testimony of Abbott witnesses or Abbott documents.  Further, there was no testimony to suggest that the DexCom inventors were aware of or possessed Abbott's secret ideas.  For several additional reasons, Abbott witnesses' testimony

about the Navigator was insufficient to establish that claim 1 of the '215 Patent was fully supported

and enabled by a pre-2005 DexCom patent or patent application.

*First*, Abbott's witnesses testified that the combination of alarms in claim 1 of the '215

Patent was never practiced by the Navigator.  Mr. Harper testified that, during clinical trials, all

the thresholds for the FreeStyle Navigator were fixed and that, in the commercial product, all the

alarms were user settable.  Tr. 548:8-549:1.  No one testified that the Navigator ever had (1) a real-

time, user settable hypoglycemia alarm and (2) a predictive, fixed hypoglycemia alarm, and in fact

confirmed the opposite.

*Second*, neither Dr. Taub nor Mr. Harper testified that any specifics of the Navigator's

alarms were public prior to 2005, such that a POSA would have considered it in connection with

reading and interpreting the '549 Patent.  Indeed, a POSA[6] would not be aware of nonpublic

information.  *Volvo Penta of the Americas, LLC v. Brunswick Corp.*, 2023 WL 5440530, at *4

(Fed. Cir. Aug. 24, 2023) (POSA not aware of confidential information); *Asterias Biotherapeutics,*

*Inc. v. Viacyte, Inc.*, 2014 WL 93903, at *7 (N.D. Cal. Jan. 9, 2014) (holding that the patentee's

internal "confidential information is not relevant to the knowledge of a person of ordinary skill in

the art").

*Third*, there is no link between Dr. Taub's and Mr. Harper's testimony regarding Navigator

and the '549 Patent.  Dr. Steil is the only Abbott witness who testified about those references, but

he never testified that a POSA would have interpreted the '549 Patent a certain way based on their

testimony.  In fact, Dr. Steil rejected their testimony that the Navigator had fixed, predictive

alarms.  Tr. 656:13-16 (agreeing that, prior to 2012, Abbott "never had a product that was fixed as

---

[6]   The written description analysis is performed "from the viewpoint of a person having ordinary
skill in the field of technology of the patent as of January 1, 2005."  D.I. 561 at 19.

to the user and not user-settable or adjustable"); Tr. 706-708 (on re-direct, stating that he did not

remember Mr. Harper's testimony whether the Navigator had a fixed predictive alarm but

"[c]learly at some point much later there is a fixed alarm on this, the FreeStyle 2" [which launched

in 2020]).

> **B.  There Was Insufficient Evidence To Support A Verdict That Claims 1, 7, 19, And 23 Of The '452 Patent Are "Fully Supported And Enabled" By A Pre-2005 DexCom Patent Or Patent Application.**

Abbott alleged, and the jury found, that Abbott was licensed to claims 1, 7, 19, and 23 of

the '452 Patent (JTX-8) because those claims were fully supported and enabled by the disclosure

of U.S. Provisional Application No. 60/614,683 ("'683 Provisional," PTX-35).  For the reasons

below, there is insufficient evidence from which a reasonable jury could conclude that claims 1,

7, 19, and 23 of the '452 Patent are fully supported and enabled by the disclosure of the '683

Provisional.

> **1.  There Was Insufficient Evidence To Conclude That The '683 Provisional Fully Supported The "Relative Durometer Hardness" Limitation Of Claims 1 And 7.**

Claim 1 is directed to a system for measuring an analyte concentration in a host.  It requires,

among other things, "an electrical contact comprising a first material, wherein the first material is

associated with a first durometer hardness" and a "sealing member comprising a second material,

wherein the second material is associated with a second durometer hardness."  JTX-8.0147 at cl.

1.  Further, claim 1 requires that "the first durometer hardness is higher than the second durometer

hardness."  *Id.*  Thus, the electrical contact must have a higher durometer hardness than the sealing

member.  Claim 7 depends from claim 1 and therefore has the same requirement.

The only pre-2005 DexCom patent or patent application that Abbott relied upon was the

'683 Provisional.  As a matter of law, the '683 Provisional does not provide written description in

the manner required by 35 U.S.C. § 112 for claims 1 and 7.  Unlike the '452 Patent, which has

several columns of description concerning the durometer hardness of the seal and electrical contact (*e.g.*, JTX-8 at columns 5-6, 27-29, 56-57), the '683 Provisional lacks discussion of durometer hardness altogether.  As Abbott's expert conceded, the words "durometer hardness" do not appear in the '683 Provisional.  Tr. 883:3-8.  "Shore hardness" and the ASTM D-2240 standard are also absent, Tr. 883:15-884:10, even though "durometer hardness" in the '452 Patent means "Shore hardness, in accordance with ASTM D2240."  D.I. 561 at 16.  These facts alone demand that judgment be entered in DexCom's favor.

The only Abbott witness to testify about the '683 Provisional was its expert Dr. Schurman. The portions of the '683 Provisional that Dr. Schurman identified are insufficient to establish that the '683 Provisional disclosed claims 1 and 7 in the manner required by 35 U.S.C. § 112.

*First*, Dr. Schurman testified that the '683 Provisional disclosed metal contacts, which he presumed "would always be harder than the seal."  Tr. 825:13-826:4.  However, the '683 Provisional does not teach the combination of metallic contacts with, for example, a silicone seal. In fact, the '683 Provisional also describes metal seals. Tr. 1246:12-1247:3.  Thus, Dr. Schurman's testimony relied on a combination of examples from different embodiments, which is improper because written description cannot be shown by cobbling together elements from different embodiments that are never linked together in the specification.  *E.g.*, *Novozymes*, 723 F.3d at 1349; *Flash-Control, LLC v. Intel Corp.*, 2021 WL 2944592, at *4 (Fed. Cir. July 14, 2021).  It is even more inappropriate here because, as explained by DexCom's expert Dr. Gall, the '683 Provisional teaches away from such a combination because in the design of the '683 Provisional, "you need them [the seal and contacts] to deform a similar amount."  Tr. 1232:16-1233:11.

*Second*, Dr. Schurman pointed to the '683 Provisional's teaching that one could use carbon black elastomer for the electrical contacts.  Tr. 826:5-827:4.  He took this disclosure and presumed

that a POSA would use the same base elastomer for the seal and contacts, add carbon black to the base elastomer, and achieve electrical contacts with a higher hardness.  But the '683 Provisional does not teach to use the same base material for both the electrical contacts and sealing member. All the '683 Provisional says is the electrical contacts may be made from carbon black elastomer and the sealing member may be made from elastomeric material.  PTX-35.0023 at ¶¶118, 120. The durometer hardness ranges of "elastomeric material" and "carbon black elastomer" overlap such that carbon black elastomers may be softer than elastomers.  Tr. 1109:11-20.  For example, carbon black elastomers may have a durometer hardness as low as approximately 20 Shore A.  Tr. 1109:7-10.  Likewise, silicones (one example of an elastomer) may have a durometer hardness as high as approximately 80-90 Shore A.  Tr. 1108:21-1109:1.  Thus, knowing that the contacts are "carbon black elastomer" and the seal is an "elastomeric material" does not inform a POSA which of the contacts or seal has a higher durometer hardness.

*Finally*, Abbott presented evidence about Abbott's Navigator CGM, but the Navigator-related evidence cannot support the jury's verdict with respect to claims 1 and 7, either alone or in combination with the '683 Provisional.  The written description inquiry here is based on a pre-2005 DexCom patent or patent application, D.I. 561 at 19, and "it is the specification [of the '683 Provisional] that must demonstrate possession."  *Biogen*, 18 F.4th at 1342; *see also* D.I. 561 at 19 (pre-2005 DexCom patent or application must itself describe "each element" of the claim).  The Navigator Premarket Approval Application ("PMA") document is not a DexCom patent or patent application and is not referenced anywhere in the '683 Provisional.  It is a highly confidential Abbott document, and it is dated after the January 1, 2005 cutoff.  Tr. 885:12-886:23; PTX-542.

Even if able to be considered, the Navigator PMA shows that Abbott used different base materials for the Navigator seal and electrical contacts.  Tr. 830:9-831:4.  That undercuts Dr.

Schurman's opinion that a POSA would start with the same base material for both the seal and contacts and then add carbon black.   Likewise, Dr. Schurman's testimony regarding other references that were not pre-2005 DexCom patents or patent applications, such as Funderburk, cannot support his written description opinions.   Those references could not form the basis of a verdict that claims 1 and 7 were fully supported in the manner required by 35 U.S.C. § 112 by a pre-2005 DexCom patent or patent application.

### 2.    There Was Insufficient Evidence To Conclude That The '683 Provisional Fully Supported And Enabled The "Sandwich" Limitation Of Claims 19 And 23.

Claim 19 is directed to a system for measuring a glucose concentration in a host.   It requires, among other things, a "transcutaneous glucose sensor" and a "sealing member comprising a sealing member upper portion and a sealing member lower portion." JTX-8.0148 at cl. 19.   Further, claim 19 requires that "an ex vivo [out of body] portion of the transcutaneous glucose sensor is **sandwiched** between the sealing member upper portion and the sealing member lower portion." *Id.* (emphasis added).   Claim 23 depends from claim 19 and therefore includes the same requirement.

The only pre-2005 DexCom patent or patent application that Abbott relied upon was the '683 Provisional.   As a matter of law, the '683 Provisional did not provide written description in the manner required by 35 U.S.C. § 112 for claims 19 and 23.   The '452 Patent includes numerous embodiments of a sealing member, including the sealing members depicted in Figures 4D through 4H.   Of all those embodiments, only Figure 4H depicts a seal with the claimed sandwich structure. The '452 Patent explains:

> FIG. 4H is a schematic cross-sectional view of a sealing member 36 in an alternative embodiment wherein a large gap 400 is provided between the sealing member upper portion 408 and the sealing member lower portion 410.   These portions 408, 410 may or may not be connected; however, they are configured to sandwich the

13

> sensor and sealant (e.g., grease) therebetween.  The sealing member
> 36 illustrated with reference to FIG. 4H can provide ease of
> manufacture and/or product assembly with a comprehensive sealing
> ability.  Additional gaps (with or without sealant) can be provided
> in a variety of locations throughout the sealing member 36; these
> additional gaps, for example, provide space for excess sealant.

JTX-8.0103 at 31:41-53.  As explained above and shown in Figure 4H, the sandwich structure for

the sealing member has an upper portion and a lower portion.  The '452 Patent, however, contrasts

the sandwich structure of Fig. 4H with seals that use a unitary block of sealing material that is

pierced (e.g., Fig. 4D).



FIG. 4H                    FIG. 4D

This was confirmed by the testimony of Peter Simpson, a named inventor on the '452

Patent and the '683 Provisional.  Mr. Simpson explained that the sandwich seal structure is "very

different" from the other seals shown in the '452 Patent, which are "bricks, these solid pieces of

silicone that we pierce."  Tr. 1041:2-12.  In the sandwich structure, there are "two different sheets

of material, two different sheets of silicone with a gap between them, and the sensor would be in

that gap."  *Id.*  Mr. Simpson explained that, unlike the solid seals, in the Figure 4H sandwich seal

"that needle is now in a gap, so it's not physically touching the soft gummy seal material, and so

that deployment [of the sensor] could happen without the seal moving at all . . . ."  *Id.* at 1042:7-

20.

The sandwich structure for the seal that is disclosed and claimed in the '452 Patent is simply

not described in the '683 Provisional.  The only Abbott witness to offer testimony concerning the

'683 Provisional was its expert Dr. Schurman.  He did not identify any evidence of a sandwich

structure for a seal, with an upper and lower portion.  Instead, he offered the opinion that the term

"sandwich" is superfluous and includes a unitary-block seal design, which would encompass the

embodiments that the '452 Patent did not identify as a sandwich structure.  Tr. 870:5-871:4.  He

conceded that Figure 4 of the '683 Provisional, which he relied on as supposedly providing written

description for a sandwich structure, in fact shows a "unitary piece of material" like Figure 4D of

the '452 Patent.  Tr. 870:23-871:4.  When the seal of the '683 Provisional is pierced, Dr. Schurman

conceded the seal is ***not*** split into two pieces, but remains unitary.  Tr. 875:16-20.  Dr. Schurman

further admitted that Figure 4D depicts a sealing member that is a unitary piece of material (Tr.

865:13-866:9), that Figure 4H shows a seal that is separated with an upper and lower portion and

a gap between the portions (Tr. 866:15-867:10), and that the word "sandwiched" is used "only in

reference to Figure 4(h)" (Tr. 869:11-20).  At bottom, Dr. Schurman agreed that his opinion was

essentially that "in a unitary piece of material, because the seal is just a solid piece of material, that

that sensor that's in the seal is sandwiched in the seal."  Tr. 871:14-19.  Applying the ordinary

meaning of "sealing member upper portion," "sealing member lower portion," and "sandwiched"

(D.I. 561 at 17), a reasonable jury could not have concluded that the '683 Provisional fully supports

and enables claims 19 and 23.

Finally, Abbott presented evidence about Abbott's Navigator CGM, but the Navigator-

related evidence cannot support the jury's verdict with respect to claims 19 and 23, either alone or

in combination with the '683 Provisional.  First, the Navigator is not a pre-2005 DexCom patent

or patent application.  It therefore cannot be the basis of a license under the plain language of the

SLA.  D.I. 561 at 19.  Second, to the extent it could be considered at all, there is no testimony that

links the confidential and non-public Navigator documents to the '683 Provisional with respect to

the sandwich limitations.  For example, Dr. Schurman, the sole Abbott witness to testify about the

'683 Provisional, did not explain how the post-2005 Navigator information would impact a POSA's interpretation of the '683 Provisional in any way concerning a sandwich structure.

### C. DexCom Did Not Breach The Dispute Resolution Clause.

As a matter of law, DexCom did not breach the dispute resolution clause ("DRC") of the SLA (¶J.1) by filing its patent infringement case without first going through the dispute resolution process or by failing to meet once litigation was filed.

Abbott concedes that "not every patent dispute between the parties triggers the DRC." D.I. 376 at 6. The SLA's dispute resolution process applies only to "dispute(s) [that] arise(s) from, under or relating to this Agreement." SLA ¶J.1. No reasonable jury could have found DexCom breached SLA ¶J.1 by failing to engage in the SLA's required dispute resolution process "before initiating its U.S. . . . patent litigation[]" or "after ADC Inc. initiated that process."

*First*, DexCom did not breach SLA ¶J.1 by failing to engage in the SLA's dispute resolution procedures prior to filing this case because no dispute concerning the SLA existed before the case was filed. DexCom asserted patent infringement claims it believed not to be licensed to Abbott under the SLA. Tr. at 1401:24-1403:1. It was not until Abbott subsequently informed DexCom it believed it had a license to the asserted patents that a "dispute" "relate[d] to" the SLA arguably came into existence.

The evidence at trial unambiguously showed Abbott did not provide notice to DexCom of "any dispute(s) aris[ing] from, under or relating to" the SLA at any time prior to June 30, 2021, the date DexCom filed its lawsuit. *See* Tr. at 910:6-911:14. Moreover, Abbott offered no evidence at trial showing DexCom knew or had reason to know there would be a dispute arising from, under, or relating to the SLA prior to Abbott giving notice. The only evidence in the record is that DexCom did not believe the asserted patents were licensed and that Abbott did not provide notice until after DexCom filed suit. Tr. at 910:6-911:14; 1401:24-1403:1.

16

The case law supports DexCom's position that a "dispute" related to the SLA first "arose" at the time Abbott informed DexCom of its belief it had a license to DexCom's patents.   In *Krumme*, the Second Circuit, in addressing the timing of a "dispute" under the parties' contract, held that the parties' dispute arose when they "began fighting" about their rights under the agreement at issue.   *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 140 (2d Cir. 2000). Similarly, the Seventh Circuit in *S.A. Healy* addressed a dispute resolution clause applying to "all claims . . . arising from interpretation of or performance under" the relevant agreement, holding the parties' "dispute" did not "arise[]" until party indicated its contrary position under contract. *S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist.*, 50 F.3d 476, 480 (7th Cir. 1995).

In light of the unambiguous contract language[7] and the evidence presented at trial, which indisputably showed the parties' dispute arose *after* DexCom filed its patent infringement action, no reasonable jury could have found that DexCom breached the DRC by filing its lawsuit.   *See, e.g.*, *L.P.P.R., Inc. v. Keller Crescent Corp.*, 532 F. App'x 268, 273 (3d Cir. 2013) (reversing district court's denial of judgment as a matter of law in breach of contract action where movant offered the sole reasonable interpretation of the disputed contract provision).

*Second*, DexCom did not breach the DRC as a matter of law by declining ADC's invocation of the dispute resolution process after litigation had already been filed.  SLA ¶J.1 sets forth steps, including in-person meetings between the parties, to be taken *after* a "dispute[] arise(s) from, under or relating to" the SLA but *before* "exercis[ing] any remedies available under this Agreement or under the law or equitable principles of any applicable jurisdiction, including instituting litigation." As explained above, DexCom had already instituted litigation against Abbott before any "dispute"

---

[7]   The only contractual term the Court instructed the jury was ambiguous was the definition of "ADC Products."  D.I. 561 at 13.

arose concerning the SLA; DexCom did not institute litigation after there was an SLA-related dispute (i.e., when Abbott informed DexCom of its belief it had a license to DexCom's asserted patent claims under the SLA).  Tr. at 910:6-911:14.  Thus SLA ¶J.1 is inapplicable, and DexCom did not breach SLA ¶J.1 as a matter of law.  *See, e.g.*, *Xerox Corp. v. Lantronix, Inc.*, 342 F. Supp. 3d 362, 367-69 (W.D.N.Y. 2018) (holding dispute resolution clause did not apply because it merely "set[] certain preconditions *before* either party" could initiate a lawsuit) (emphasis added).

The Court's own prior rulings confirm that the DRC only applies before filing a new lawsuit.  Abbott moved for summary judgment on DexCom's condition precedent defense arguing that undertaking the dispute resolution process was not required before moving to transfer because the motion to transfer was "not initiating litigation."  D.I. 324 at 11.  The Court agreed and entered summary judgment in Abbott's favor on that defense, finding that "the SLA's dispute resolution clause concerns the duties of the parties *before* filing a lawsuit."  D.I. 483 at 4 (emphasis added). The DRC is thus inapplicable to Abbott's assertion that DexCom's refusal to meet after litigation was underway constitutes a breach of the SLA.  DexCom has therefore not breached the DRC as a matter of law.

### D.     Freestyle Libre Products With Readers With Integrated Blood Glucose Meters Are Not "ADC Products."

As a matter of law, the FreeStyle Libre 14-day and Libre 2 products with readers are not "ADC Products," and no reasonable jury could have found otherwise.

The SLA's definition of "ADC Products" includes certain ADC In Vivo Sensors and other components "if used with ADC In Vivo Sensors," including "hardware or software . . . for determining, processing, monitoring or displaying glucose values."  SLA ¶A.3.  However, this definition goes on to set forth an important exclusion.  Tr. 262:7-8.  Namely, "'ADC Products'

also do not include Ancillary Products."  SLA ¶A.3.  "Ancillary Products" is defined to include "meters used with disposable blood analyte biosensors."  SLA ¶A.6.

The parties do not dispute that the reader in the FreeStyle Libre 14-day and Libre 2 systems functions as a blood glucose meter for disposable blood analyte biosensors, i.e., disposable test strips.  Tr. 552:25-553:8; 893:13-22 ("The blood glucose test strip meter is built into the reader unit itself.").  Thus, a reasonable jury could only conclude that the reader in the Libre 14-day and Libre 2 products is an Ancillary Product, and therefore is excluded from the definition of ADC Products.  Tr. 894:10-14.

At trial, Abbott raised two arguments in support of its assertion that the at-issue products met the "ADC Products" definition.  *First*, it argued that the SLA's "[f]or the avoidance of doubt" clause means that a blood glucose meter is included in the definition of "ADC Products."  Tr. 262:15-263:6; 1480:4-13.  That clause states that "if ADC Products are used in combination with Ancillary Products, then neither such Ancillary Products nor the combination shall be included within the definition of ADC Products, but the ADC Products themselves will continue to be included within the definition of ADC Products."  SLA ¶A.3.  That clause cannot support Abbott's position.  It plainly states that if an ADC Product is used with something that is not an ADC Product, then the "combination" will *not* be "included within the definition of ADC Products."  *Id*. That is the precise situation here—the ADC sensor, an ADC Product, is combined with something that is not an ADC Product, the reader/blood glucose meter.  The combination of the ADC sensor and the reader/blood glucose meter is therefore not an ADC Product, even if the sensor itself remains an ADC Product.[8]

---

[8]  That the reader itself may be "hardware or software . . . for determining, processing, monitoring or displaying glucose values" (SLA ¶A.3) is irrelevant.  The reader, because it is also a blood glucose meter, is expressly excluded from the definition of ADC Products.

*Second*, Abbott argued that because the claims do not recite a blood glucose meter, and because DexCom's infringement allegations are purportedly not directed to the test strip functionality in the reader itself, the combination of an ADC sensor and a reader falls within the ADC Products definition.  Tr. 1480:14-1481:1.  This argument is entirely inconsistent with the language of the SLA.  No part of the ADC Products definition references patents or infringement allegations.  SLA ¶A.3.  The "ADC Products" definition is instead based on the functionality recited within that definition, and it expressly excludes blood glucose meters, such as the Abbott readers, from its scope.  If Abbott's position were accepted, it would lead to the absurd result that the question of whether Abbott's products, including their reader, satisfy the ADC Products definition depends on the patent being asserted and the phrasing of the infringement allegations.

DexCom is entitled to judgment as a matter of law that the Libre 14 Day and Libre 2 with reader do not satisfy the ADC Products definition.

OF COUNSEL:
David Bilsker
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(213) 443-3000

Kevin P.B. Johnson
Todd M. Briggs
Margaret Shyr
Sara L. Pollock
Zak Randell
Cat Williams
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
(650) 801-5000

/s/ Nathan R. Hoeschen
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for DexCom, Inc.*

Brian P. Biddinger
Cary E. Adickman
Alex Zuckerman
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Nathan Hamstra
Jonathon Studer
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400

Valerie Lozano
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Isabel Peraza
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I St. NW #900,
Washington, DC 20005
(202) 538-8000

Gavin Frisch
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
111 Huntington Ave., Suite 520
Boston, MA 02119
(617) 712-7100

Trevor J. Quist
QUINN EMANUEL URQUHART
  & SULLIVAN LLP
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
(801) 515 7300

Theodore Kwong
HILGERS GRABEN PLLC
10000 N. Central Expy., Suite 400
Dallas, TX 75231
(972) 645-3097

Sophie A. Hood
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA  94111-1809
(415) 391-5400

Dated: September 8, 2023

## <u>CERTIFICATE OF SERVICE</u>

I, Nathan R. Hoeschen, hereby certify that on September 8, 2023, this document was

served on ADC-MNAT@morrisnichols.com, MHM-ADC@mcandrews-ip.com,

abbottdexcomdelitigation@kirkland.com, and on the persons listed below in the manner

indicated:

### <u>BY EMAIL</u>

Jack B. Blumenfeld
Rodger D. Smith II
Anthony D. Raucci
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
rsmith@morrisnichols.com
araucci@morrisnichols.com

Amanda J. Hollis
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
amanda.hollis@kirkland.com

Benjamin A. Lasky
Ashley Ross
Christopher T. Jagoe
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
benjamin.lasky@kirkland.com
ashley.ross@kirkland.com
christopher.jagoe@kirkland.com

Leland G. Hansen
Alexander M. Vogler
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, IL 60661
(312) 887-8000
lhansen@mcandrews-ip.com
avogler@mcandrews-ip.com

Ellisen Shelton Turner
Joshua P. Glucoft
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
(310) 552-4200
ellisen.turner@kirkland.com
josh.glucoft@kirkland.com

Kristina R. Cary
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500
kristina.cary@kirkland.com

Jason M. Wilcox P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000
jason.wilcox@kirkland.com

*/s/ Nathan R. Hoeschen*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for DexCom, Inc.*